**In re SEALED CASE.**

No. 87–5247.

United States Court of Appeals,
District of Columbia Circuit.

Argued Aug. 5, 1987.

Decided Aug. 20, 1987.

Barry S. Simon, with whom Brendan V. Sullivan, Jr., Terrence O'Donnell and Nicole K. Seligman, Washington, D.C., were on brief, for appellant.

Paul L. Friedman, Washington, D.C., with whom Guy Miller Struve, New York City, Jeffrey Toobin, Washington, D.C., and James E. McCollum, Washington, D.C., were on brief, for appellee.

James M. Spears, Deputy Asst. Atty. Gen., Dept. of Justice, with whom Joseph E. diGenova, U.S. Atty., Richard K. Willard, Asst. Atty. Gen., Robert Kopp, Douglas N. Letter, Thomas Millet and Harold J. Krent, Attys., Dept. of Justice, Washington, D.C., were on brief, for amicus curiae, U.S., urging affirmance.

Before RUTH BADER GINSBURG, WILLIAMS and D.H. GINSBURG, Circuit Judges.

**D.H. GINSBURG, Circuit Judge:**

Lt. Col. Oliver North appeals an order of the district court holding him in contempt for refusing to comply with a grand jury subpoena. North challenges the contempt order on the ground that it was issued by a grand jury presided over by Independent Counsel Lawrence Walsh and his associate counsel who, North contends, lack the legal authority to conduct that grand jury proceeding. North can prevail only if we find that Walsh's investigation cannot rely on either of two claimed sources of authority: (1) the December 19, 1986, appointment of Walsh as an independent counsel under the Ethics in Government Act[1] (Ethics Act), or (2) the Attorney General's March 5, 1987, delegation of investigative and prosecutorial authority of his own to Walsh. North raises constitutional challenges to both sources of authority as well as statutory challenges to the Attorney General's delegation.

On remand from the previous appeal to this court, the district court upheld the authority of Walsh and his associate counsel under the Attorney General's appointment.[2] The district court also held that it was unnecessary to address the question of the constitutionality *vel non* of the independent counsel provisions of the Ethics Act. We affirm each holding as well as the district court's order of July 10, 1987, directing North to comply with the subpoena.

## I. BACKGROUND

### A. Appointment by the Special Division

Pursuant to the Ethics Act, 28 U.S.C. § 592(c)(1), the Attorney General on December 4, 1986, filed an application with the Independent Counsel Division of this court (the "Special Division") seeking the appointment of an independent counsel with jurisdiction

to investigate whether violations of U.S. federal criminal law were committed by Lieutenant Colonel Oliver L. North, other United States Government officials, or other individuals acting in concert with Lieutenant Colonel North or with other United States Government officials, whether or not covered by the Independent Counsel provisions of the Ethics in Government Act, from in or around January 1985 (the exact date being unknown) to the present, in connection with the sale or shipment of military arms to Iran and the transfer or diversion of funds

---

**1.** Pub.L. 95–521, Title VI, § 601(a), 92 Stat. 1867 (1978), as amended by Pub.L. 97–409, 96 Stat. 2039 (1983); Pub.L. 98–473, 98 Stat. 2030 (1984); and Pub.L. 98–620, 98 Stat. 3359 (1984)

(codified as amended in 28 U.S.C. §§ 591–98 (1982 & Supp. III)).

**2.** *In re Sealed Case,* 666 F.Supp. 231 (D.D.C. 1987).

realized in connection with such sale or shipment. The independent counsel should have jurisdiction sufficiently broad to investigate and prosecute any and all violations of U.S. federal criminal law which his or her investigation may establish in this matter, and any related matters over which the independent counsel may request or accept jurisdiction pursuant to 28 U.S.C. § 594(e).

On December 19, 1986, the Special Division filed an order, pursuant to its authority under 28 U.S.C. § 593(b), appointing Walsh as independent counsel, thereby conferring upon him, within the jurisdiction it prescribed, "all investigative and prosecutorial functions and powers of the Department of Justice, the Attorney General, and any other officer or employee of the Department," with exceptions not here relevant, pursuant to 28 U.S.C. § 594(a).[3] In exercising its authority under 28 U.S.C. § 593(b) to define the prosecutorial jurisdiction of the independent counsel, the Special Division granted Walsh jurisdiction beyond that requested by the Attorney General. Most significantly, the Special Division expanded the time frame of the inquiry into arms sales to Iran to include the period "since in or about 1984," rather than "from in or around January 1985," and the Special Division granted Walsh the additional jurisdiction to investigate "the provision or coordination of support for persons or entities engaged as military insurgents in armed conflict with the Government of Nicaragua since 1984." Soon after the Special Division announced Walsh's appointment, the President issued a statement saying that "Mr. Walsh has my promise of complete cooperation, and I have instructed all members of my administration to cooperate

fully with the investigation in order to ensure full and prompt disclosure."[4]

B. Appointment by The Attorney General

Exercising his authority under 28 U.S.C. § 594(a)(1), Walsh empaneled a grand jury in this district on January 28, 1987. On February 24, 1987, North filed a complaint claiming that the independent counsel provisions of the Ethics Act are unconstitutional, and seeking to enjoin the grand jury proceedings.[5] In response to this constitutional challenge to Walsh's authority, the Attorney General on March 5, 1987, promulgated a regulation designed "to assure the courts, Congress, and the American people that [Walsh's] investigation will proceed in a clearly authorized and constitutionally valid form regardless of the eventual outcome of [North's] litigation."[6]

In accordance with the Attorney General's expressed intent "to make certain that the necessary investigation and appropriate legal proceedings can proceed in a timely manner,"[7] the regulation established the "Office of Independent Counsel: Iran/Contra"—under the direction of an Independent Counsel to be appointed by the Attorney General—and delegated to that Counsel authority identical to that provided to an independent counsel by the Ethics Act.[8] The regulation also sets forth the jurisdiction of the "Independent Counsel: Iran/Contra"[9] in exactly the same terms employed by the Special Division in establishing the jurisdiction of Independent Counsel Walsh. The regulations' provisions relating to the removal of the "Independent Counsel: Iran/Contra" also largely parallel those found in the Ethics Act.[10] In particular, the regulation sets forth the

---

**3.** Order, *In re Oliver North, et al.,* Div. No. 86–6 (D.C.Cir. December 19, 1986).

**4.** 22 Weekly Comp.Pres.Doc. 1658 (1986).

**5.** *North v. Walsh and Meese,* Civ.No. 87–0457 (D.D.C.).

**6.** 52 Fed.Reg. 7270 (March 10, 1987) (to be codified as 28 C.F.R. Parts 600 and 601).

**7.** *Id.* at 7271.

**8.** *Compare* the following provisions of the Ethics Act, 28 U.S.C. §§ 594(a)-(g), *with* parallel provisions in the regulations, 28 C.F.R. § 600.1 (a)-(g), 52 Fed.Reg. at 7271.

**9.** 28 C.F.R. § 601, 52 Fed.Reg. at 7272–73.

**10.** *Compare* 28 C.F.R. § 600.3, 52 Fed.Reg. at 7272; *with* 28 U.S.C. § 596.

same grounds for removal as does the Ethics Act,[11] and it provides that "an Independent Counsel originally appointed by court order shall have such rights of review as provided by said order and by section 596(a)(3) of Title 28 of the United States Code."[12] The provisions of the regulation concerning "reporting and congressional oversight" and "relationship with components of the Department of Justice" are also virtually identical with parallel provisions in the Ethics Act.[13] The regulation also includes provisions that state:

> (a) Nothing in this chapter is intended to modify or impair any of the provisions of the Ethics in Government Act relating to Independent Counsel (sections 591–598 of Title 28 of the United States Code), or any order issued thereunder.
>
> (b) If any provision of the Ethics in Government Act relating to Independent Counsel (sections 591–598 of Title 28 of the United States Code) or any provision of this chapter is held invalid for any reason, such invalidity shall not affect any other provision of this chapter, it being intended that each provision of this chapter shall be severable from the Act and from each other provision.[14]

On March 5, 1987, the date the Attorney General's regulation was promulgated, Independent Counsel Walsh signed an Appointment Affidavit naming him Independent Counsel: Iran/Contra.

## C. North's Challenges to Walsh's Authority

In response to the Attorney General's regulation of March 5, 1987, North filed on the following day a new complaint in district court,[15] which was later consolidated with his previously filed petition for injunctive relief. On March 12, 1987, the district court rendered its decision in both actions.[16] Citing *Younger v. Harris,* 401 U.S. 37, 46, 91 S.Ct. 746, 751, 27 L.Ed.2d 669 (1970), for the proposition that "a party who seeks to enjoin a criminal investigation has a particularly heavy burden,"[17] the district court denied North's request that it enjoin the on-going grand jury investigation, stating that "Colonel North, like any other potential criminal defendant, can raise his objections by appropriate motions, *if* and *when* an indictment is entered."[18]

Subsequent to the district court's dismissal of his complaint seeking injunctive relief, the grand jury issued a subpoena to North, with which he refused to comply. The district court having thereupon held him in contempt, North appealed to this court. In support of the contempt order, Walsh and the Attorney General argued that North's challenge to the prosecutor's legal authority was no more ripe for review then than it had been when he sought civil injunctive relief raising the same challenge. We disagreed,[19] concluding that a recalcitrant witness' "claim that a subpoena was applied for and issued under the signature

---

11. *Compare* 28 C.F.R. § 600.3(a)(1), 52 Fed.Reg. at 7272; *with* 28 U.S.C. § 596(a)(1).

12. 28 C.F.R. § 600.3(a)(3), 52 Fed.Reg. at 7272.

13. *Compare* 28 C.F.R. § 600.2, 52 Fed.Reg. at 7271–72, *and id.* at § 600.4, 52 Fed.Reg. at 7272; *with* 28 U.S.C. §§ 595 and 597, respectively.

14. 28 C.F.R. § 600.5, 52 Fed.Reg. at 7272.

15. *North v. Walsh and Meese,* Civ. No. 87–0626 (D.D.C.).

16. *North v. Walsh and Meese,* 656 F.Supp. 414 (D.D.C.1987), *app. pending,* Nos. 87–5058, 87–5059 (D.C.Cir.).

17. *Id.* at 421.

18. *Id.* at 423 (emphasis in original). This ruling was similar to one handed down by another judge and affirmed by this court, rejecting Mi-

chael Deaver's request, based on a virtually identical constitutional challenge to that presented by North, that Independent Counsel Whitney North Seymour, Jr. be enjoined from seeking Deaver's indictment from the grand jury empaneled to investigate his lobbying activities. *Deaver v. Seymour,* 656 F.Supp. 900 (D.D.C. 1987), *aff'd,* 822 F.2d 66 (D.C.Cir.1987) *stay denied,* 55 U.S.L.W. 3641 (March 18, 1987) (Rehnquist, C.J., in chambers). *See also Deaver v. United States,* — U.S. —, 107 S.Ct. 3177, 3178, 97 L.Ed.2d 784 (1987) (Rehnquist, C.J., in chambers) ("There will be time enough for applicant to present his constitutional claim to the appellate courts if and when he is convicted of the charges against him.").

19. *In re Sealed Case,* 827 F.2d 776 (D.C.Cir. 1987).

**54**

of unauthorized persons" [20] was ripe for review under *United States v. Ryan*, 402 U.S. 530, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971), which stated:

> If, as he claims, the subpoena is unduly burdensome or otherwise unlawful, he may refuse to comply and litigate those questions in the event that contempt or similar proceedings are brought against him. Should his contentions be rejected at that time by the trial court, they will then be ripe for appellate review.

*Id.* at 532, 91 S.Ct. at 1582 (footnote omitted).[21] The factual record was inadequate, however, for us to determine whether Walsh and his associate counsel could rely solely on the grant of authority under the Attorney General's March 5, 1987, regulation as the legal basis for the subpoena issued to North. If the regulation provided such authority—and if that authority had been exercised by Walsh and his counsel— it appeared that we might not need to reach the question of whether the Ethics Act provided an independent source of authority, a question that would have required us to address the constitutionality *vel non* of the appointment of an independent counsel by the Special Division pursuant to the provisions of the Ethics Act.

We therefore remanded the case to the district court for it to determine "whether the Attorney General had legal authority to delegate the powers which he purported to convey in the [March 5, 1987] regulation ..., and if so, whether appropriate authori-

ty has been properly vested in Mr. Walsh and his associates." [22] In addition, because of our uncertainty about the precise application for this case of certain language in the Supreme Court's decision in *Bowsher v. Synar*, —— U.S. —— n. 5, 106 S.Ct. 3181, 3189 n. 5, 92 L.Ed.2d 583 (1986), we also directed the district court to determine "whether any aspect of the relationship between the special division of this court and the Independent Counsel requires consideration of the constitutionality of the statute even if the Attorney General's appointment is otherwise valid." [23]

After taking evidence, the district court "determined that the parallel appointment of Mr. Walsh under the Attorney General's regulation was factually and legally valid and that appropriate authority has been vested in him and his associates." [24] In response to our second question, the district court "also determined that the limited relationship between the Special Division ... and the Office of Independent Counsel does not require consideration of the constitutionality of the [Ethics] Act." [25] This appeal followed.

## II. ANALYSIS

### A. Appointment by the Attorney General

As we indicated when remanding the case to the district court, North in effect claims that the subpoena was "unduly burdensome or otherwise unlawful" because it had been "applied for and issued under the

---

**20.** *Id.* at 778.

**21.** For additional support, we noted that "issues analogous to appellant's have been litigated, and thus treated as ripe, in the contempt setting." *In re Sealed Case*, 827 F.2d at 778. This was in reference to the line of cases that includes *In re Persico*, 522 F.2d 41 (2d Cir.1975), in which the Second Circuit reached the merits of a recalcitrant witness' contention that a subpoena was unlawful because, he argued, the "special attorney" for the Government had not been "specifically directed" by the Attorney General, in accordance with 28 U.S.C. § 515(a), to conduct the grand jury proceeding. *See In re Sealed Case, supra* at 778, and cases therein cited.

In holding that *Ryan* permits a grand jury witness to challenge the legal authority of a

government attorney, we withheld judgment as to whether the Court intended the language in *Ryan* to overrule *Blair v. United States*, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979 (1919), which held that a recalcitrant grand jury witness could not challenge the constitutionality of the underlying statute violation of which the grand jury was investigating. *In re Sealed Case, supra* at 778–79.

**22.** Order, *In re Sealed Case*, No. 87–5168 (D.C.Cir. June 8, 1987).

**23.** *Id.*

**24.** *In re Sealed Case, supra* note 2, 666 F.Supp. at 232.

**25.** *Id.*

55

signature of unauthorized persons." [26]  In accordance with the "well-established principle ... that normally [a c]ourt will not decide a constitutional question if there is some other ground upon which to dispose of the case," [27] we address first North's contention that Walsh and his associate counsel did not derive the requisite authority from the Attorney General's parallel appointment of March 5, 1987. Because the "investigative and prosecutorial functions and powers" purportedly conveyed to the Office of Independent Counsel: Iran/Contra by the Attorney General's regulation include the power to conduct grand jury proceedings and to issue the type of subpoena in dispute here,[28] the only questions raised by this contention are whether the Attorney General's delegation is lawful and, if so, whether that delegated authority has in fact been exercised by Walsh and his associate counsel.

#### i. Is the Attorney General's Delegation Lawful?

■ We have no difficulty concluding that the Attorney General possessed the statutory authority to create the Office of Independent Counsel: Iran/Contra and to convey to it the "investigative and prosecutorial functions and powers" described in 28 C.F.R. § 600.1(a) of the regulation. The statutory provisions relied upon by the Attorney General in promulgating the regulation are 5 U.S.C. § 301 and 28 U.S.C. §§ 509, 510, and 515.[29] While these provisions do not explicitly authorize the Attorney General to create an Office of Independent Counsel virtually free of ongoing supervision, we read them as accommodating the delegation at issue here.[30]

■ Moreover, the Attorney General's delegation did not violate the Ethics Act, 28 U.S.C. § 597(a), which provides:

Whenever a matter is in the prosecutorial jurisdiction of a[n] independent counsel or has been accepted by a[n] independent counsel under [28 U.S.C. § 594(e)], the Department of Justice, the Attorney General, and all other officers and employees of the Department of Justice shall suspend all investigations and proceedings regarding such matter ... except insofar as such independent counsel agrees in writing that such investigation

---

**26.** *In re Sealed Case,* 827 F.2d at 778.

**27.** *Escambia County v. McMillan,* 466 U.S. 48, 51, 104 S.Ct. 1577, 1579, 80 L.Ed.2d 36 (1984) (per curiam). *See Ashwander v. TVA,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

**28.** *See* 28 C.F.R. § 600.1(a), 52 Fed.Reg. at 7271, which provides that the "investigative and prosecutorial functions and powers shall include," *inter alia,* "[c]onducting proceedings before grand juries and other investigations," subsection (a)(1), and "[m]aking applications to any Federal court for ... subpoenas[ ] or other courts orders," subsection (a)(7). We note also that the Department of Justice, *amicus curiae,* which is entitled to considerable deference in interpreting its own regulations, *see Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), has never maintained that either the grand jury proceeding or the specific subpoena before us exceeded the scope of the authority that the Attorney General delegated in the regulation.

**29.** *See* 52 Fed.Reg. at 7270–72. Section 301 of Title 5 of the United States Code authorizes a department head to issue regulations. Sections 509, 510, and 515 of Title 28 outline the authority of the Attorney General. Section 509 vests in the Attorney General, with four exceptions not relevant here, "all functions" of other officers, employees, and agencies of the Department of Justice. Section 510 authorizes the Attorney General to delegate this authority to "any other officer, employee, or agency of the Department of Justice." Finally, section 515(a) authorizes the Attorney General to conduct "any kind of legal proceeding, civil or criminal, including grand jury proceedings ... which United States attorneys are authorized by law to conduct," and it authorizes the Attorney General to delegate this authority to "any other officer of the Department of Justice, or any attorney specially appointed by the Attorney General under law." Together, these provisions vest in the Attorney General the "investigative and prosecutorial functions and powers" described in the regulation, 28 C.F.R. § 600.1(a), and authorize him to delegate such functions and powers to others within the Department of Justice.

**30.** In *U.S. v. Nixon,* 418 U.S. 683, 694–96, 94 S.Ct. 3090, 3100–01, 41 L.Ed.2d 1039 (1974), the Supreme Court presupposed the validity of a regulation appointing the Special Prosecutor, a position indistinguishable from the one at issue here.

or proceedings may be continued by the Department of Justice.

The Attorney General's power of appointment extends only to the Department of Justice; hence the Office of Independent Counsel: Iran/Contra is "within" the Department, though free of ongoing supervision by the Attorney General.[31] Walsh has acknowledged that his signing the appointment form under the regulation constitutes an "agree[ment] in writing" within the meaning of § 597(a). The purpose of that provision—preventing investigations by the Department of Justice which would duplicate and possibly impede the work of Independent Counsel—is preserved by the present arrangement.

■ North contends that the Attorney General's delegation of authority to the Independent Counsel violates the Appointments Clause of the Constitution, Art. II, § 2, which provides that the President

shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other Public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law; but the Congress may by Law vest the Appointment of such inferior Officers, as they

think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

Citing *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), North contends that, given the substantial authority delegated to him, the Independent Counsel: Iran/Contra is not an "inferior Officer" but an "Officer of the United States"[32] who may be appointed only by the President with the advice and consent of the Senate. North raises essentially the same contention with respect to the authority given to the independent counsel under the Ethics Act. We need not decide whether the Ethics Act creates such an "Officer of the United States," however, in order to conclude that the regulation does not. The crucial difference is that the Independent Counsel: Iran/Contra serves only for so long as the March 5, 1987, regulation remains in force. Subject to generally applicable procedural requirements, the Attorney General may rescind this regulation at any time, thereby abolishing the Office of Independent Counsel: Iran/Contra.[33] As a result, we must conclude that the Independent Counsel: Iran/Contra "is charged with the performance of the duty of the superior [i.e., the Attorney General] for a limited time and under special and temporary conditions." *United States v. Eaton*,

31. In his brief, Walsh disputes the district court's conclusion that—as he puts it—"under the regulation the Office of Independent Counsel is inside rather than outside the Department of Justice." Brief for Appellee Independent Counsel at 52. Walsh and his staff acknowledge that they are within, and claim the authority of, the Office of Independent Counsel: Iran/Contra established by the regulation. *Id.* at 43. They have argued, however, that the Attorney General had the authority, and used it, to locate this Office "outside" the Department of Justice. *Id.* at 52–63. Nonetheless, at oral argument they clearly stated that their arguments were made in the alternative and that if the court holds that this Office is "within" the Department of Justice, as we do, then they would not on that account abjure their authority under the regulation.

32. North consistently refers to Independent Counsel Walsh as a "superior Officer," which term is not to be found in the text of the Constitution; we prefer the words of the Framers to a tendentious neologism.

33. In *Nader v. Bork*, 366 F.Supp. 104, 108–09 (D.D.C.1973), the district court found arbitrary and capricious the October 23, 1973, rescission of the regulation creating the Office of Watergate Special Prosecutor, inferring from its repromulgation three weeks later that it was rescinded only to permit a result—the firing of Archibald Cox—that "could not legally have been accomplished while the regulation was in effect under the circumstances presented." *Id.* at 109. Cf. *Vitarelli v. Seaton*, 359 U.S. 535, 545–46, 79 S.Ct. 968, 975–76, 3 L.Ed.2d 1012 (1959). We are not presented with similar facts here and thus need not decide whether that analysis was correct. Nor does the Attorney General's March 5, 1987, regulation require, as a condition of its rescission, the consent of the Independent Counsel: Iran/Contra. Accordingly, we need not decide either whether the district court in *Nader v. Bork* properly relied upon the alternative ground that the rescission was invalid because Cox had not consented to it, as the regulation purported to require. 366 F.Supp. at 108.

169 U.S. 331, 343, 18 S.Ct. 374, 379, 42 L.Ed. 767 (1898). As such, "he is not thereby transformed into the superior and permanent official," *id.*, but rather remains an "inferior Officer" whom the Attorney General, as the "Head[ ] of [a] Department[ ]," may appoint under the express terms of the Appointments Clause.[34] *See id.* at 343–44, 18 S.Ct. at 879; *United States v. Germaine*, 99 U.S. (9 Otto) 508, 509–10, 25 L.Ed. 482 (1878).[35]

ii. Has the Independent Counsel Properly Exercised the Authority Delegated?

North argues further that, "[e]ven assuming that the Attorney General had the authority to delegate the powers purportedly delegated under the regulation, that authority has not been properly vested in Mr. Walsh or his associate counsel, who are therefore acting without any lawful authority whatsoever."[36] North argues that neither Walsh nor his associate counsel may act pursuant to the regulation because the associate counsel have not formally accepted appointments in the Office of Independent Counsel: Iran/Contra[37] and both they

and Walsh have not been "specifically directed by the Attorney General" to conduct the grand jury investigation, as required by 28 U.S.C. § 515(a). We address each argument in turn.

■ It is less than perfectly clear whether associate counsel have formally accepted appointments under the regulation.[38] The Attorney General delegated to Walsh the express authority to hire associate counsel. In a March 13, 1987, letter, Assistant Attorney General Stephen Trott wrote to Walsh that, "[i]n order to effectuate the appointment of your staff, you should have each employee complete the standard 'Affidavits of Appointment' form ... and be sworn-in in the presence of a person designated in 5 U.S.C. § 2903." [39] The record contains no evidence that Walsh's associate counsel have taken any actions pursuant to Trott's request. North contends that the associate counsel therefore may act only in accordance with their previous appointments by the Special Division. Accordingly, North argues, any legal authority they possess proceeds from the Ethics Act, and not from the regulation.

**34.** Because the Attorney General created the Office of Independent Counsel: Iran/Contra and retains the authority to rescind his March 5, 1987, regulation, North's reliance on *Buckley v. Valeo*, 424 U.S. at 126, 96 S.Ct. at 685 ("any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States'") is misplaced. Unlike the Federal Election Commissioners in *Buckley*, the Independent Counsel: Iran/Contra derives his authority not by direct delegation from Congress, but rather through the Attorney General. Having been appointed by the President and confirmed by the Senate, the Attorney General was properly vested with the investigative and prosecutorial authority described in 28 U.S.C. § 509, and could delegate it to others "for a limited time and under special and temporary conditions." *United States v. Eaton*, 169 U.S. at 343, 18 S.Ct. at 379.

For the same reason, North can derive no support from *Humphrey's Executor v. United States*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935), and *Myers v. United States*, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926), which involve the constitutional limitations on the authority of Congress to place restrictions on the removal power of the President. The Supreme Court has long recognized that an agency may impose limits on its own exercise of discretionary authority to remove officers and employees. *See Vitarelli v. Seaton*, 359 U.S. at 539–40, 79 S.Ct. at

972–73; *Service v. Dulles,* 354 U.S. 363, 383–89, 77 S.Ct. 1152, 1162–65, 1 L.Ed.2d 1403 (1957).

**35.** *See also United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Service v. Dulles,* 354 U.S. at 366, 77 S.Ct. at 1154; and *United States ex rel Accardi v. Shaughnessy,* 347 U.S. 260, 265–67, 74 S.Ct. 499, 502–03, 98 L.Ed. 681 (1954), each of which implicitly recognizes that an "officer of the United States" may lawfully delegate his or her authority to an "inferior Officer."

**36.** Brief of Appellant at 21. Under Federal Rule of Criminal Procedure 6(d), an "[a]ttorney for the government ... may be present while the grand jury is deliberating or voting." Rule 54 then defines "attorney for the government" to include "the Attorney General, an authorized assistant of the Attorney General, a United States Attorney, [or] an authorized assistant of a United States Attorney."

**37.** Walsh accepted appointment as Independent Counsel: Iran/Contra when he signed the appointment and oath form to that effect on March 5, 1987.

**38.** 28 C.F.R. § 600.1(c), 52 Fed.Reg. at 7271.

**39.** Exhibit 6 to Brief of Appellant.

Under the particular circumstances of this case, however, we find that appointment to the one office carries over to the other. The offices established under the Ethics Act and under the regulation have identical investigative and prosecutorial powers and jurisdiction. In addition, Walsh serves as Independent Counsel for each office, with the parallel authority to appoint associate counsel. Finally, the terms of the appointment and oath forms for the two offices are virtually identical. In sum, by previously submitting the appointment and oath forms to the Special Division, the associate counsel accepted appointments and took oaths identical to those that would have been required under the regulation, in order to perform the same jobs in a functionally indistinguishable office to that established by the regulation. Undoubtedly for these reasons, the Department of Justice accepts that the appointments and oaths made pursuant to the Ethics Act are sufficient as appointments and oaths of associate counsel within the Office of Independent Counsel: Iran/Contra.[40] We agree with the district court that "[n]ew appointment documents, therefore, would have served no purpose, as associate counsel had already made the necessary representations and were bound to their responsibilities under the first set of forms."[41]

North also contends that the Attorney General failed to comply with the requirement of 28 U.S.C. § 515(a) that he "specifically direct[ ]" Walsh and his associate counsel to conduct a grand jury investigation. In so arguing, North relies upon the lack of any "letter of authority" from the Attorney General (or his delegate) to each attorney, which is customarily provided in order to define the scope of the grand jury investigation and identify the attorneys conducting it. Although the cases concerning compliance with section 515(a) almost uniformly involve a dispute over whether a particular "letter of authority" specifically authorized the investigation being conducted,[42] no court has held that section 515(a) requires that there be any "letter of authority" as such. In fact, as the Department of Justice emphasizes, the Seventh Circuit has recently held that an attorney was "specifically directed" to conduct a grand jury proceeding even though a "letter of appointment" had not been sent until after the indictment issued. *United States v. Balistrieri*, 779 F.2d 1191, 1207–10 (7th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 1490, 89 L.Ed.2d 892 (1985).

▬ We need not determine how we would decide *Balistrieri*, however, in order to resolve the case before us. In this case, no "letters of authority" were sent to Walsh and his associates, either before or after they began to act pursuant to the authority delegated by the Attorney General. What section 515(a) requires is a "specific[ ] direct[ion]"—not a "letter of authority." Congress imposed this requirement in order "to protect the government from abuse of discretion by a special attorney or unnecessary personnel expenditures by the Attorney General, not to limit the Attorney General's power to prosecute."[43] From the facts of this case, we conclude that a specific direction has been given, and that the purpose of the statute has been met.

It was the Attorney General, after all, who initially requested that the Special Division appoint an independent counsel. When the Special Division appointed

---

40. Brief on Behalf of Amicus Curiae United States at 16 n. 7, 19–21. There is no evidence in the record that the Department ever renewed the request made in General Trott's letter of March 13, although it never received the affidavits as requested.

41. *In re Sealed Case, supra* note 2, 666 F.Supp. at 235 (footnote omitted).

42. *See e.g., United States v. Prueitt*, 540 F.2d 995, 999–1003 (9th Cir.), *cert. denied*, 429 U.S. 959, 97 S.Ct. 790, 50 L.Ed.2d 780 (1976); *United States v. Morrison*, 531 F.2d 1089, 1092 (1st Cir.), *cert. denied*, 429 U.S. 837, 97 S.Ct. 104, 50 L.Ed.2d 103 (1976); *Infelice v. United States*, 528 F.2d 204 (7th Cir.1975); *In re Persico*, 522 F.2d 41, 56–66 (2d Cir.1975); *United States v. Wrigley*, 520 F.2d 362 (8th Cir.), *cert. denied*, 423 U.S. 987, 96 S.Ct. 396, 46 L.Ed.2d 304 (1975).

43. *In re Persico*, 522 F.2d at 63.

Walsh, it delineated the jurisdiction of his investigation with considerable specificity. The President immediately responded to this appointment by pledging the "complete cooperation" of the executive branch.[44] Later, when North challenged the legal authority of Walsh's investigation, the Attorney General, in order "to assure the courts, Congress, and the American people that [Walsh's] investigation will proceed in a clearly authorized and constitutionally valid form," [45] specially created the Office of Independent Counsel: Iran/Contra, provided it with the identical powers and jurisdiction employed by the independent counsel appointed by the court, and appointed Walsh as Independent Counsel: Iran/Contra. Accordingly, Walsh and his associate counsel have received, from the inception of their investigation, more than the usual and at least the necessary degree of "specific[] direct[ion]" required by statute. To find fault in the Department of Justice's failure to prepare "letters of authority" would be to demand the same duplicative effort as involved in requiring the associate counsel to submit appointment forms and take oaths, for a second time, in order to carry out their existing responsibilities within a functionally equivalent and in all material respects an actually identical office. We will not so exalt forms over substance.[46]

**iii. Summary**

The Attorney General promulgated the March 5, 1987, regulation in order "to make certain that the necessary investigation and appropriate legal proceedings can proceed in a timely manner." [47] He possessed the legal authority, both constitutional and statutory, to create the Office of Independent Counsel: Iran/Contra. Walsh and his associate counsel have accepted appointments in that office, and their grand jury investigation complies with the "specific[] direct[ion]" they have received since December 19, 1986. As a result, the Attorney General's March 5, 1987, regulation has provided Walsh and his associate counsel with the legal authority necessary to conduct the grand jury investigation—and in particular, to issue the subpoena to North—regardless of whether they may also have such authority under the Ethics Act. Accordingly, because the subpoena North has received was "applied for and issued under the signature of [ ]authorized persons," [48] it is not "unduly burdensome or otherwise unlawful." [49]

**B. The Tenure Issue**

■ In remanding the case, we asked the district court to determine "whether any aspect of the relationship between the special division of this court and the Independent Counsel requires consideration of the constitutionality of the statute even if the Attorney General's appointment is oth-

---

44. *See supra* note 4 and accompanying text.

45. 52 Fed.Reg. at 7270; *see supra* note 6 and accompanying text.

46. Finally, North contends that, even if Walsh and his associate counsel satisfied the requirements discussed in the text, their actions cannot be predicated upon that authority because, according to North, "Walsh has never purported to act pursuant to the regulation." Brief of Appellant at 21–22. We consider irrelevant Walsh's legally erroneous belief that the Attorney General may create offices outside the Department of Justice. *See supra* note 31. The only other evidence upon which North relies is Walsh's failure to proclaim in documents filed with the court that he was acting pursuant to authority derived from the regulation as well as from the Ethics Act. *See* Brief of Appellant at 34. We are persuaded, however, by Walsh's argument that "as a matter of law, because Independent Counsel has executed an appoint-

ment affidavit pursuant to the regulation as well as one pursuant to the statute, all actions taken by the Office of Independent Counsel have been taken pursuant to both the regulation and the statute." Brief for Appellee Independent Counsel at 43 (citations omitted). *See In re Sealed Case, supra* note 2, 666 F.Supp. at 235 n. 9 ("That the Independent Counsel's office chose to consistently use the label assigned to it under the [Ethics] Act does not belie the Independent Counsel's assertion that every official action of his office was taken under both the Act and the regulation.").

47. 52 Fed.Reg. at 7271; *see supra* note 7 and accompanying text.

48. *In re Sealed Case, supra* note 19, 827 F.2d at 778.

49. *United States v. Ryan,* 402 U.S. at 532, 91 S.Ct. at 1582.

erwise valid."[50] As indicated above, we requested the district court to address this question because, upon initial inspection, we were unsure whether the Supreme Court's decision in *Bowsher v. Synar* required us to address the question of the constitutionality *vel non* of the removal provisions of the Ethics Act,[51] even though no one alleges that the Attorney General is likely to seek Walsh's removal in the foreseeable future. In *Bowsher* the Court

> reject[ed the] argument that consideration of the effect of a removal provision is not "ripe" until that provision is actually used.... "[I]t is the Comptroller General's presumed desire to avoid removal by pleasing Congress, which creates the here-and-now subservience to another branch that raises separation-of-powers problems." The Impeachment Clause of the Constitution can hardly be thought to be undermined because of non-use.

106 S.Ct. at 3189 n. 5 (citation omitted).

In this case, the removal provisions in the Ethics Act and in the Attorney General's regulation are identical.[52] In general, they provide that the Attorney General may remove Walsh for cause only. What differentiates the two schemes is that the Attorney General may rescind or amend the regulation, thereby withdrawing the delegated authority or Walsh's security of tenure, whereas in order to effect the parallel result under the Ethics Act, the Congress and the President, or Congress overriding a veto, would have to legislate to repeal the statute, arguably a less likely development. North appears to argue that Walsh's more secure status under the Ethics Act, combined with the fact that under the Act's removal provisions the court that appointed him would review his removal, creates in Walsh a "here-and-now subservience" to the Special Division and, under *Bowsher*, compels us to reach the merits of his constitutional challenge.[53]

In *Bowsher*, the constitutional claim was "ripe" because the removal provision, by making the Comptroller General the servant of the Congress and not of the President, necessarily had an immediate and real impact on how he performed his duties.[54]

---

**50.** Order, *In re Sealed Case, supra* note 23 and accompanying text.

**51.** The relevant provisions are found in 28 U.S.C. § 596(a):

(1) A[n] independent counsel appointed under this chapter may be removed from office, other than by impeachment and conviction, only by the personal action of the Attorney General and only for good cause, physical disability, mental incapacity, or any other condition that substantially impairs the performance of such independent counsel's duties.

. . . . .

(3) A[n] independent counsel so removed may obtain judicial review of the removal in a civil action commenced before the division of the court [i.e., the Special Division] and, if such removal was based on error of law or fact, may obtain reinstatement or other appropriate relief.

**52.** *Compare* 28 U.S.C. § 596 *with* 28 C.F.R. § 600.3, 52 Fed.Reg. at 7272. In particular, the grounds for removal are identical.

**53.** Brief of Appellant at 37–38.

**54.** As the district court in *Synar v. United States* perceptively observed, a similar analysis applied with respect to bankruptcy judges whose terms, under the Bankruptcy Code, expired after fourteen years. In explaining why the Supreme Court reached the constitutional challenge to that provision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), the district court stated that:

It is true, of course, that the expiration of fourteen years was certain to occur while in the present case congressional removal is not. But that is quite irrelevant to whether the two provisions differ in their immediate impact, so that one is more "ripe" than the other. The immediate impact in *Northern Pipeline* came not from the certainty of expiration of fourteen years, but from the bankruptcy judge's awareness of the possibility of nonreappointment. It is his presumed desire to avoid that possibility by pleasing the appointing power, just as in the present case it is the Comptroller General's presumed desire to avoid removal by pleasing Congress, which creates the here-and-now subservience to another branch that raises separation-of-powers problems.

*Synar v. United States,* 626 F.Supp. 1374, 1392 (D.D.C.1986). In a similar vein, the district court analogized the "immediate effect" that Congress' latent removal power had on the Comptroller General to the effect that "an agency's ... formal assertion (by rule) of the power" to "punish[] certain conduct" has on a party whose conduct is so regulated. *Id.* at 1393, comparing *Abbott Laboratories v. Gardner.*

Under the Balanced Budget and Emergency Deficit Control Act of 1985, the Comptroller General's duties involved the question of how to allocate scarce government monies; as illustrated by the budget controversies from which that Act emerged, it is particularly in the context of fiscal policy that "th[e] system of division and separation of powers produces conflicts, confusion, and discordance...." *Bowsher v. Synar*, 106 S.Ct. at 3187. In that context, too, one's institutional allegiance goes a long way, if not all the way, in determining how one acts: or, as is often said of such interbranch conflicts, where one stands depends upon where one sits. The three-judge district court opinion [55] on which *Bowsher* relied for its ripeness analysis makes the point that assertion of the authority to remove has an impact distinct from the mere possibility that an officer will in fact be removed.[56] "It is the prior assertion of *authority to remove* embodied in the tenure statute that has the immediate effect, and presumably the immediate purpose, of causing the Comptroller General to look to the legislative branch rather than the President for guidance" in making his day-to-day budgetary decisions under the Deficit Reduction Act. *Synar v. United States*, 626 F.Supp. at 1393 (emphasis added). Thus the Comptroller General—out of a "presumed desire to avoid removal by pleasing Congress"—would be significantly influenced in making decisions determining, in substantial part, whether the petitioners would receive anticipated federal benefits. *Id.* at 1392. So viewed, the Supreme Court in *Bowsher* was virtually compelled to conclude that the separation of powers question was ripe for review even though the removal provision had not been exercised and, in fact, might never be.[57]

In contrast, while North claims to suffer a harm from the removal provisions of the Ethics Act that he challenges as unconstitutional, he does not identify any way in which this "here-and-now" effect is even arguably felt by him.[58] We have already held that the Attorney General's parallel appointment provides Walsh with the legal authority, independent of the Ethics Act, to conduct the grand jury investigation from which this case arises. In light of this parallel source of authority, any harm to North that is a sufficiently direct and immediate consequence of the Ethics Act must involve an investigative or prosecutorial activity that Walsh would not undertake if he depended for his authority *solely* upon the Attorney General's regulation. In other words, North could only feel an immediate impact from the Act's removal provisions at this juncture if Walsh, without the benefit of the Act, would not take a certain action out of fear that the Attorney General would rescind or amend the regulation in order to abolish or limit his authority thereunder, but with the Act in place does so act, disregarding the risk that the Attorney General will remove him or limit

**55.** *Synar v. United States,* 626 F.Supp. 1374 (D.D.C.1986).

**56.** *Citing Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

**57.** We do not read *Bowsher,* however, to hold that the constitutionality of a statute is ripe for review any time a party raises a separation of powers claim. For example, suppose, improbably, that Congress transferred the National Weather Service from the Department of Commerce to the Administrative Office of the United States Courts, and that this prompted someone—perhaps an employee who had hoped to move up within the Commerce Department—to bring a declaratory judgment suit challenging the move on separation of powers grounds. In terms purely of when that issue would be "ripe" for judicial review, it is difficult to see how the change in allegiances occasioned by the move would realistically have any effect on how the Service's employees perform their duties. Accordingly, it would not be unreasonable for a court to consider such a declaratory judgment action unripe until a plaintiff complains of some conduct by the newly-moved Service that would likely have been different if it had remained within the Department of Commerce.

**58.** Instead, North instances various *ex parte* contacts between Walsh and his associates and the Special Division. He has not made it clear, however, how he thinks these contacts adversely affect him here and now; *at most* he could be read to imply that, if the Special Division were ever to review Walsh's removal by the Attorney General, it would so identify itself with him as to bias its judgment. This implication is no more a present effect, however, than the hypothetical removal to which it relates.

his authority because the Special Division acts as the guarantor of his authority under the Ethics Act.

There is not the slightest reason to believe, however, that Walsh would not have convened the grand jury and issued the challenged subpoena to North if the Ethics Act did not exist. The Attorney General, by creating the Office of Independent Counsel: Iran/Contra in the image of the independent counsel's office under the Ethics Act, intended that Walsh would conduct his investigation just as he would pursuant to his identical authority under the Ethics Act so that, even if the Act were held unconstitutional, its absence would not in any way impair Walsh's investigation or prosecutions. In fact, the Attorney General stated as much in the preamble to the regulation.[59]

Furthermore, even if Walsh had acted in a manner demonstrably beyond the Attorney General's delegation of authority, during the course of this investigation but apart from issuing this subpoena, it would be of no avail to North on this appeal. In accordance with the principles we announced in *Deaver v. Seymour,* and in our opinion remanding this case to the district court, North may litigate only the lawfulness of the specific subpoena issued to him, not that of such other investigative or prosecutorial actions as Walsh may undertake.[60]

### III. CONCLUSION

North appeals the district court's order holding him in contempt, challenging the legal authority of Independent Counsel Walsh and his associate counsel to conduct the grand jury that issued the subpoena with which he has refused to comply. We hold that Walsh and his associate counsel derive the necessary legal authority from the Attorney General's regulation of March 5, 1987, regardless of whether they also have this authority pursuant to their appointments under the Ethics Act. North's challenge to the subpoena does not make his constitutional challenge to the removal provisions of the Ethics Act reviewable at this time.[61]

---

**59.** *See* 52 Fed.Reg. at 7270–71.

**60.** As we said in *Deaver v. Seymour, see supra* note 18, and as the district court said in *North v. Walsh and Meese, see supra* note 16, courts do not, except in very limited circumstances not alleged here, entertain the claim of a person subject to a criminal investigation that the investigation is unlawful and must therefore be enjoined. Courts exercise this restraint because, as Justice Frankfurter explained, "[b]earing the discomfiture and cost of a prosecution for crime even by an innocent person is one of the painful obligations of citizenship." *Cobbledick v. United States,* 309 U.S. 323, 325, 60 S.Ct. 540, 541, 84 L.Ed. 783 (1940).

In previously remanding this case to the district court, we found a narrow pre-indictment exception to this rule, under which a recalcitrant grand jury witness, such as North, may raise the claim that his or her subpoena was "applied for and issued under the signature of unauthorized persons." *In re Sealed Case, supra* note 19, 827 F.2d at 778. This exception, though, was not intended to swallow the general rule barring judicial interference with the conduct of a grand jury proceeding. As a result, in asserting that the subpoena issued to him was "unduly burdensome or otherwise unlawful," *United States v. Ryan,* 402 U.S. at 532, 91 S.Ct. at 1582, North may raise only those issues that relate to the specific subpoena with which he refused to comply. He may not rely upon the fortuitous circumstance of receiving that subpoena to effect an end run around the rule we announced in *Deaver v. Seymour* and in so doing challenge the entire investigation.

**61.** *Buckley v. Valeo* does not suggest a contrary result. In that decision, which involved a suit for declaratory judgment, the Supreme Court held ripe for review a separation of powers challenge to Congress' appointment of Federal Election Commission members, 424 U.S. at 113–18, 96 S.Ct. at 679–82, to whom Congress had given "extensive rulemaking and adjudicative powers" and "direct and wide ranging" enforcement powers over the conduct of political elections. *Id.* at 110–11, 96 S.Ct. at 678. Moreover, the Court found that "the Commission ha[d] undertaken to issue rules and regulations," and that "[w]hile many of its other functions remain[ed] as yet unexercised," that exercise was nevertheless "all but certain." 424 U.S. at 116–17, 96 S.Ct. at 681. Although the politically-related nature of the Commission's duties and the present exercise of some powers and the "all but certain" exercise of others might not in themselves render "ripe" the separation of powers claim in a declaratory judgment setting, the Court relied heavily upon the additional consideration that "Congress was understandably most concerned with obtaining a final adjudication of as many issues as possible" as swiftly as possible. *Id.* at 117, 96 S.Ct. at 681. *Cf. Duke Power*

The judgment of the district court is therefore

*Affirmed.*

WILLIAMS, Circuit Judge, concurring and dissenting:

I concur in the court's opinion insofar as it upholds the authority of Independent Counsel Walsh and his subordinates under the Attorney General's regulations creating "Independent Counsel: Iran/Contra" (the "Regulations"). I write separately on that issue only to explain why I regard any revocation of the Regulations as free from judicial review, a factor that greatly facilitates my agreement with the conclusion that Walsh's appointment under the Regulations can be squared with the Appointments Clause, Art. II, § 2.

I dissent from the court's conclusion in that Counsel Walsh's regulatory authority renders North's attack on the Ethics in Government Act unripe.

### I. REVOCABILITY OF THE REGULATIONS

North contends that Counsel Walsh's tenure under the Regulations violates the Appointments Clause, Art. II, § 2, by constituting him a "superior officer" whose appointment is not made pursuant to that clause, *i.e.*, by the President with the advice and consent of the Senate. The court responds that since the Attorney General can rescind the Regulation "at any time," Majority ("Maj.") at 56, Counsel Walsh is merely filling a part of the office of the Attorney General " 'for a limited time and under special and temporary conditions,' " *id.* (citing *United States v. Eaton*, 169 U.S. 331, 343, 18 S.Ct. 374, 379, 42 L.Ed. 767 (1898)). *Eaton* upheld the non-presidential appointment of a vice consul to temporarily wield all the powers of an ailing consul, even though Art. II, § 2 specifically identifies consuls as "superior officers." Accordingly, Walsh's similarly defeasible appointment is also valid. So far, I agree.

A premise of my sharing this conclusion is my belief that the Attorney General's revocation of the Regulations would be unreviewable.[1] Such revocation would, I believe, be exempt from judicial review as a decision "committed to agency discretion by law." 5 U.S.C. § 701(a)(2) (1982).

The Supreme Court has long recognized that "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693, 94 S.Ct. 3090, 3100, 41 L.Ed.2d 1039 (1974) (citing *Confiscation Cases*, 7 (U.S.) Wall 454, 19 L.Ed. 196 (1869)) (other citations omitted); *see also United States v. Batchelder*, 442 U.S. 114, 123–24, 99 S.Ct. 2198, 2203–04, 60 L.Ed.2d 755 (1979); *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978). It recently reaffirmed this principle emphatically. *Heckler v. Chaney*, 470 U.S. 821, 832, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985) (agency decision not to enforce "presumptively unreviewable"); *Wayte v. United States*, 470 U.S. 598, 607, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985) ("the Government retains 'broad discretion' as to whom to prosecute"). In both *Wayte* and *Chaney* the Court found judicial review peculiarly inappropriate. *See Wayte*, 470 U.S. at 607, 105 S.Ct. at 1531 ("the decision to prosecute is particularly ill-suited to judicial review"); *Chaney*, 470 U.S. at 831, 105 S.Ct. at 1656 ("the general unsuitabiilty for judicial re-

*Co. v. Carolina Env. Study Group*, 438 U.S. 59, 82, 98 S.Ct. 2620, 2635, 57 L.Ed.2d 595 (1978).

The configuration of factors that rendered the constitutional claim in *Buckley* ripe are not present here. Most importantly, whereas Congress expressed a desire for prompt review of the Federal Election Commission's authority, the Ethics Act contains no parallel provision. Moreover, as we have indicated, *supra* note 60, courts properly view declaratory actions such as that in *Buckley* with considerable disfavor in the criminal context; yet for the court today to reach North's constitutional claim would, as a practical matter, have the same effect as entertaining a declaratory action.

1. Of course superior officers are typically (and perhaps necessarily) dismissible by the President at will, so it may seem ironic to suggest that ease of dismissal facilitates upholding the appointment under the Regulations. But ease of dismissal by the Attorney General clearly establishes that Walsh is not a superior officer under the Regulations, thus reconciling his powers with the fact of his not having been appointed by the President.

view of agency decisions to refuse enforcement").

The Court identified factors militating in favor of discretion and against review, all of which are applicable here. Assuming the existence of a "technical violation," *Chaney*, 470 U.S. at 831, 105 S.Ct. at 1656, enforcement decisions depend upon a multiplicity of concerns, all within the expertise of the agency: likelihood of success, relation to overall enforcement goals, and status within the agency's priorities. *Chaney*, 470 U.S. at 831–32, 105 S.Ct. at 1655–56; *Wayte*, 470 U.S. at 607, 105 S.Ct. at 1531. Such a decision involves an agency's comparison of expected cost and return for the particular case against the impact of deploying those resources elsewhere—a decision that can hardly be made without a grasp of the full range of enforcement possibilities before the agency. The administrator has this grasp (or should); a reviewing court does not. The Court further noted that judicial intervention into prosecutorial decisions "delays the criminal proceeding, threatens to chill law enforcement ..., and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Wayte*, 470 U.S. at 607, 105 S.Ct. at 1531; *see also Chaney*, 470 U.S. at 834, 105 S.Ct. at 1657.

The Attorney General's issuance or revocation of regulations such as the ones in question is similarly discretionary. In substance the Regulations simply implement his organization of his department. Such decisions, like the ones in *Chaney* and *Wayte*, turn on the relationship between numerous factors as to which the Attorney General is expert, and the courts are not. Again they revolve around agency resource allocation priorities: potentialities for administrative confusion or duplication, economies of effort deriving from characteristics of the decisions being made, and—perhaps most relevant to the present case— the *de facto* priorities that are likely to emerge from the structure. (Streamlined, special-focus sub-agencies are likely to be relatively single-minded; commitment of an issue to such a sub-agency is an assignment of special priority to the field in question.) The traditional presumption of non-

reviewability of prosecutorial decisions applies by analogy here.

There are, to be sure, limits on the presumption of nonreviewability, but none that appears applicable to this case. Absent a claim that an agency decision was based on some impermissible factor—a belief that the agency lacked jurisdiction (or general policy amounting to total abdication), or unjustifiable criteria such as race or the accused's exercise of statutory or constitutional rights, *see Chaney*, 470 U.S. at 833 n. 4, 838, 105 S.Ct. at 1656 n. 4, *Wayte*, 470 U.S. at 608, 105 S.Ct. at 1531— the only basis for finding reviewability would be congressional provision of guidelines detailed enough to provide the courts with "law to apply," and thus a basis for review. *Chaney*, 470 U.S. at 833, 105 S.Ct. at 1659; *see also Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971).

As in *Chaney*, the search for any "law to apply" is singularly unproductive. The sources of authority invoked by the Attorney General speak in the broadest imaginable terms: 5 U.S.C. § 301 (generally authorizing heads of departments to promulgate regulations); 28 U.S.C. § 509 (vesting in the Attorney General virtually all functions of "other officers" of the Department of Justice (*i.e.*, officers other than those specified in immediately prior sections)); *id.* § 510 (stating that the Attorney General "may from time to time make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General"); *id.* § 515(a) (allowing the Attorney General, or any other officer of the Department, "or any attorney specially appointed by the Attorney General under law," to conduct various legal proceedings, including grand jury proceedings).

Accordingly, the revocation and promulgation of the Regulations appear committed to agency discretion by law.

This conclusion makes dismissal of North's Art. II, § 2 attack on the Regulations a comparatively simple matter. Giv-

en the Attorney General's complete legal freedom to dispose of Counsel Walsh by revocation of the Regulations, Walsh is no more a "superior officer" under the Regulations than was the vice consul appointed in *Eaton* to exercise consular duties until the executive removed him at its pleasure.

In view of my position on judicial review of revocation, I need not address the Art. II, § 2 issue that would be presented if such an act by the Attorney General were reviewable. It is plainly a more difficult case.

## II. THE RIPENESS OF NORTH'S ATTACK ON THE ACT, GIVEN THE VALIDITY OF THE REGULATIONS

All members of the court agree that Walsh has valid authority under the Regulations.[2] The remaining question is whether, notwithstanding that authority, there is any occasion to consider North's attacks on Walsh's tenure under the Act. Under the doctrinal terminology of *Bowsher v. Synar*, —— U.S. ——, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), the problem is whether the issue is "ripe."

North contends that, notwithstanding any authority under the Regulations, Walsh's incremental tenure under the Act—his independence of the executive and possible subservience to the Special Court and Congress[3]—is so great as to affect his conduct "here-and-now." Clearly the gulf between the two forms of legal tenure is huge. The Attorney General is legally free to sweep the Regulations aside at will. Under the Act, by contrast, the Attorney General must establish "cause," and, perhaps most important, must convince the Special Court that there has been no error "of fact or law" in that finding. Thus the Special Court, which selected Walsh and

might well be expected to view him as its protege, exercises effectively *de novo* review over dismissal. The Regulation affords gossamer tenure, the Act steel.

That the Act's incremental tenure is likely to affect Walsh's day-to-day, "here-and-now" conduct seems indisputable. As I read the cases, this likelihood permits one against whom the distorted authority is wielded to raise separation-of-powers challenges to the legislation creating the distortion. And this is true, I believe, even though the object of the exercise of authority (here North) cannot directly trace the injuring exercise (service of a *subpoena duces tecum*) to the distorting element in Walsh's authority.

In challenges to the authority of a non-Article III court on the grounds that the challenger is entitled to a court enjoying Article III's exceptional tenure provisions, the assumption that inadequate tenure may prejudice the challenger is so automatic that it usually goes unmentioned. *See, e.g., Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982); *Palmore v. United States,* 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973); *Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932); *cf. Ex parte Bakelite Corp.,* 279 U.S. 438, 49 S.Ct. 411, 73 L.Ed. 789 (1929). On at least one occasion, however, the Court explicitly stated that there was no need to inquire into the actual conduct of the decisionmaker, or to trace his or her rulings to influence from any institution on which, by virtue of the tenure arrangements, he or she might be dependent. *See Glidden Co. v. Zdanok,* 370 U.S. 530, 533, 82 S.Ct. 1459, 1463, 8 L.Ed.2d 671 (1962).

---

**2.** At least for me, this is subject to a caveat based on possible intertwining of the Regulations with the Act. *See infra,* p. 69.

**3.** North notes that the Special Court's decision to vest in the Independent Counsel far broader jurisdiction than that proposed by the Attorney General followed communications to the Special Court from members of the then minority of the Senate Judiciary Committee, urging such an expansion. Letter from Joseph R. Biden, Jr.,

*et al.* to Special Division for Independent Counsel (Dec. 9, 1986). The episode suggests a point that should be borne in mind throughout: the label "independent" is not necessarily descriptive of true relations. Powers abhors a vacuum. Unhitching the Independent Counsel from the executive may make the office naturally prone to domination by the branch that represents its primary competitor.

In *Bowsher* the Court extended this principle—automatic inference of distorting effects from unconstitutional tenure—from the context of claims to an Article III tribunal to that of a general separation-of-powers attack on an officer's tenure. It treated as "ripe" the issue whether Congress's power to remove the Comptroller General invalidated its effort to vest certain executive powers in him under the Gramm-Rudman-Hollings Act (more formally, the Balanced Budget and Emergency Deficit Control Act of 1985, P.L. 99–177, 99 Stat. 1037, 2 U.S.C.A. § 901 *et seq.* (West Supp.1987)). Ripeness was created, the Court found, by the Comptroller General's "here-and-now subservience" to Congress. 106 S.Ct. at 3189 n. 5. (The footnote adopted the analysis of the district court, *Synar v. United States,* 626 F.Supp. 1374, 1392 (D.D.C. 1986), which relied explicitly on one of the Article III cases, *Northern Pipeline.*)

In evaluating the *Bowsher* Court's standards for linking the tenure defect to plaintiffs' harm, one must examine the role of the Comptroller General under Gramm-Rudman. In each year the Directors of the Office of Management and Budget ("OMB") and the Congressional Budget Office ("CBO") (the executive's and Congress's champions, respectively) were to prepare estimates of the deficit for the coming year. If the estimated deficit exceeded specified amounts, each director was to calculate program reductions pursuant to rules provided in the act. *See Synar,* 626 F.Supp. at 1377. They were to forward these estimates and program reductions to the Comptroller General, who was to issue his report on the same issues. He in turn was to forward that report to the President, who was bound to implement his findings. When the *Bowsher* action was brought, one round of this had occurred—through the issuance of a presidential implementing order. *Id.*

Among the plaintiffs was a union of government employees, whose cost-of-living adjustments (COLAs) had already been suspended, and were about to be canceled, pursuant to that order. *Id.* at 1380–81. Thus its members were injured by the operation of the act. But the union evidently made no effort to trace the size of the cutbacks emerging from the Comptroller General's edict to his subservience to Congress. If the CBO's deficit estimates were larger than OMB's, thus compelling more severe cutbacks, neither court bothered to mention it. If OMB and CBO split on the union members' COLAs and the Comptroller General's decision leaned unduly toward CBO's, again neither court alluded to the point. Clearly neither considered direct evidence of the distorting effect necessary to the outcome.

Another feature of *Bowsher* is directly relevant here. The Senate, defending the Comptroller General's role, noted that his removal could occur only by means of a joint resolution, which to take legal effect would require either the President's approval or passage by two thirds of both houses. *See id.* at 1393 & n. 21. Accordingly, it argued that the court need no more consider the removal provision than it need consider the obvious and omnipresent possibility that Congress might later pass a law purporting to remove him. The district court responded that the tenure provision had "the immediate effect, and presumably the immediate purpose, of causing the Comptroller General to look to the legislative branch rather than the President for guidance." [4] *Id.* at 1393.

The district court opinion thus manifests great sensitivity to the likelihood that subtle variations in the quality of tenure will affect conduct. In *Bowsher,* Congress's merely *signaling* its ability to discharge the Comptroller General was enough, even though the ability signaled was no more than what existed anyway. And neither the district court nor the Supreme Court demanded any showing whatsoever that the alleged illegality of the tenure would

---

**4.** The Supreme Court, though noting that the dismissal resolution could be vetoed, merely observed that the veto could be overridden. 106 S.Ct. at 3189–90 n. 7. It did not address the similarity between Congress's asserted power to remove by resolution under the act and the underlying, inescapable possibility of its trying to do so by a new statute.

move the Comptroller General in a direction hostile to plaintiffs' interests.

*Buckley v. Valeo*, 424 U.S. 1, 113–18, 96 S.Ct. 612, 679–81, 46 L.Ed.2d 659 (1976), manifests the same approach. Parties expecting their interests to be affected by future rulings of the Federal Election Commission challenged the means by which its members were to be chosen, invoking both the Appointments Clause and more general separation-of-powers principles. Even though nothing whatsoever had happened to these parties (in contrast to North, who faces prison for non-obedience to the *subpoena*), the Court found the issue ripe. The Court broadly observed:

> Party litigants with sufficient concrete interests at stake may have standing to raise constitutional questions of separation of powers with respect to an agency designated to adjudicate their rights.

424 U.S. at 117–18, 96 S.Ct. at 681 (citing cases including traditional Article III cases, *Palmore* and *Glidden*). In *Buckley* the Court perceived the timing of the case as the primary problem and did not address the strength of the link between the defects in appointment process and the plaintiffs' expected injuries. Thus a fair reading of *Buckley* is that *Glidden*'s automatic inference of distorted conduct from defects in allegiance is of general applicability and not confined to claims to an Article III tribunal.

Thus not only the Supreme Court's standard treatment of Article III claims, but also *Bowsher* and *Buckley* support hospitable treatment for constitutional challenges to tenure arrangements (indeed, under *Buckley*, structural defects in allegiance generally). The Court has been ready to infer the prospect of distortions in conduct from the illegality in tenure, without more. The inference is hardly a wild leap. The maxim "Where you stand depends on where you sit" (your viewpoint depends on

your position or interest) suggests folk recognition of the point. And the founders' adoption of Article III's extraordinary tenure arrangements reflects it at the most sophisticated level of political thought. (Perhaps judges' sensitivity on the point stems from their being beneficiaries of Article III's unmatched tenure provisions.) What is most striking is the Court's willingness to draw the inference without specific proof—indeed without so much as a *hint* of connection.

But this willingness is by no means inexplicable. Despite widespread recognition of the causal link between allegiance and stance, it may rarely be susceptible of direct proof. In fact direct proof might often require embarrassing and inappropriate inquiries into thought processes, *cf. United States v. Morgan*, 313 U.S. 409, 421–22, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941) (explaining impropriety of judicial inquiry into thought processes of administrators); *Wayte v. United States*, 470 U.S. at 607, 105 S.Ct. at 1531 (explaining harm that might flow from judicial inquiry into thought processes underlying prosecutorial decisions). As a result, insistence on proof would likely put courts to a choice between permitting such dubious inquiries or denying relief to claims based on unconstitutional tenure. The Supreme Court appears to have avoided that dilemma by making the inference of distorted conduct automatic.

Nor is the logic of the automatic inference confined to claims of entitlement to an Article III court. Whenever the Constitution is construed to forbid a given arrangement of tenure (or allegiance), courts may infer that the framers believed the arrangement would distort conduct; thus *Bowsher* and *Buckley*.[5]

North's challenge to the Act is that it subjects him to coercive process by a man who is free to disregard constraints that would operate on a member of the execu-

---

**5.** At the ripeness stage, of course, the inference of distorting effect is drawn on the basis of an assumption *arguendo* that there is a substantive illegality. Once the merits are reached, obviously, the courts may uphold the challenged arrangement. *See, e.g., Palmore v. United States*, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d

342 (1973); *Crowell v. Benson*, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932); *United States v. Woodley*, 751 F.2d 1008 (9th Cir.1985) (en banc), *cert. denied*, 475 U.S. 1048, 106 S.Ct. 1269, 89 L.Ed.2d 577 (1986). Nothing in this opinion should be understood to reflect any view on the merits of North's claim.

tive branch. These constraints are at their core the presence of competing priorities, including not merely other possible lines of inquiry and offenses, but also the need for sensitivity to the inquiry's possible impact on foreign relations.[6] Walsh's subordinates have already, in open court, stated his position to be that in the event of any clash between his judgment on such matters, and that of the executive branch, he is the final judge. Exhibit 1 to Reply Brief for Appellant. Though North has not directly traced the *subpoena* to Walsh's utter freedom from the executive branch, the inference is more readily drawn than the similar inference in *Bowsher, Buckley,* or the Article III cases.

\* \* \* \* \* \*

The parties have not framed the issue in terms of standing, but we have an independent duty to satisfy ourselves that standing exists. Under the view taken by the Court in *Bowsher,* there can be little doubt that the three predicates of constitutional standing exist: North will suffer injury in fact either from going to prison or from being forced by that prospect to comply with the *subpoena duces tecum;* Walsh's *subpoena* is the direct cause of his injury; and a court order quashing the *subpoena* would redress his injury. *See Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).

It is useful, however, to explore some difficulties in this analysis, both to satisfy the standing inquiry and to derive such light as it may shed on the ripeness issue. Walsh might argue (though he hasn't) that the illegality alleged (a faulty tenure arrangement) is not the cause of North's injury, pointing to his alternative authority under the Regulations. Similarly, quashing the *subpoena* may be a null remedy if Walsh, abjuring his authority under the Act and explicitly invoking only the Regulations, were to issue another one. A judgment quashing the *subpoena* would presumably leave him free to do so, even

though it explicitly held the Act unconstitutional. Thus, North's claims of causation and redressability appear suspect under the typically rigorous standing inquiry. *See, e.g., id.; Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

In *Bowsher,* however, the Court's brief standing discussion (which basically incorporated the district court's analysis) indicates that for claims of unconstitutional tenure a relaxed concept of causation applies. *See Bowsher,* 106 S.Ct. at 3186; *Synar,* 626 F.Supp. at 1380–81. The district court found injury in fact (and, implicitly, the requisite causation) in the suspension of COLAs and in the prospect of their cancellation. *Synar,* 626 F.Supp. at 1380–81. It viewed this causal connection as enough, without any suggestion that the Comptroller General's disputed tenure actually caused his decision to be any more adverse to the union than it would have been if his tenure had been constitutionally correct.

The district court's analysis can readily be applied here: the contempt and the *subpoena* cause the harm, their extinction will redress it. But this does not answer the question that the district court neither posed nor answered: what is the causal link between the *illegality* (i.e., that part of the legislation said to render it unlawful) and the harm? The answer to that question, I believe, must lie in the same reasoning developed in the ripeness context: that in the context of a constitutional attack on tenure provisions, distorted conduct may be inferred automatically from faulty allegiances.

Redressability poses a slightly different problem. The district court found redressability in *Bowsher* in the fact that invalidation of the automatic deficit reduction process would prevent the impending cancella-

---

**6.** Walsh enjoys full prosecutorial discretion within the rather large domain confided to him under the Regulation and Act: the potential impact of constitutionally questionable allegiances is correspondingly broad. In *Bowsher,*

the discretion exercised by the Comptroller General, though enough to rank as "executive," 106 S.Ct. at 3191–92, was comparatively narrow, and the potential congressional influence correspondingly so.

 

tion of benefits. While under Gramm-Rudman's "fallback" provisions Congress might itself enact the cancellation, that possibility—patently a lesser risk—would not undermine the effectiveness of invalidating the provisions for automatic reduction. *See Synar*, 626 F.Supp. at 1381.

The present case is different. If quashing the *subpoena* and invalidating the Act were to leave Walsh completely free to proceed, would North's injury be redressed at all? The answer lies in the substantive rulings that would be possible if the court reached the merits. A court accepting North's arguments on the merits might find that the momentum of Walsh's investigation—built initially on the challenged tenure—would assuredly carry it forward to the identical point. If so, the court would have to consider whether there had been so great an intertwining of the Regulations with the Act as to call for invalidation of both. Such a remedy would, of course, leave the Attorney General free to repromulgate the Regulations (shorn, presumably, of their references to procedures under the Act). But the remedy would break the momentum, and negate the allegedly unconstitutional influence. As the panel majority finds no ripeness, and none of us has reached the merits, I need not try to resolve these issues. But I believe the analysis establishes that the selection of proper redress would turn on the conclusions reached by the court on the merits; there is no inherent obstacle to adequate redress.

\*　\*　\*　\*　\*　\*

Where a person is the object of the exercise of authority by one whose tenure he seeks to challenge on constitutional grounds (at least ones involving separation of powers), the courts are ready to infer that the allegedly defective tenure has played a significant role in bringing about that exercise of authority and its tendency to injure plaintiff. Here, the inference that North's predicament stems from the questioned tenure is at least as plausible as the parallel inference in *Bowsher* or the Article III cases, in my judgment far more so. *See also Buckley*, 424 U.S. at 113–18, 96 S.Ct.

at 679–81. Accordingly I believe his claim to be ripe and would reach the merits.