# WHETHER THE SPECIAL MASTER FOR TROUBLED ASSET RELIEF PROGRAM EXECUTIVE COMPENSATION IS A PRINCIPAL OFFICER UNDER THE APPOINTMENTS CLAUSE

*The Special Master for Troubled Asset Relief Program Executive Compensation is not a principal officer for purposes of the Appointments Clause and thus need not be appointed by the President, by and with the advice and consent of the Senate.*

November 5, 2010

## MEMORANDUM OPINION FOR THE GENERAL COUNSEL, DEPARTMENT OF THE TREASURY, AND THE SPECIAL INSPECTOR GENERAL FOR THE TROUBLED ASSET RELIEF PROGRAM

You have asked for our opinion whether the Special Master for Troubled Asset Relief Program Executive Compensation ("Special Master") is a principal officer for purposes of the Appointments Clause, U.S. Const. art. II, § 2, cl. 2, and thus must be appointed by the President, by and with the advice and consent of the Senate.[1] The position of Special Master was created by the Secretary of the Treasury, who has charged the Special Master with assisting in the enforcement of the executive compensation and corporate governance requirements established under the Emergency Economic Stabilization Act ("EESA"), Pub. L. No. 110-343, § 111, 122 Stat. 3765, 3776-77 (2008), as amended. *See* 31 C.F.R. § 30.16(a) (2010). For the reasons that follow, we conclude that the Special Master is not a principal officer.[2]

## I

On October 3, 2008, in the midst of a major crisis affecting the Nation's financial system, Congress enacted the EESA to provide the Secretary of the Treasury with immediate authority and facilities "to restore liquidity and stability to the financial system of the United States." 12 U.S.C. § 5201(1) (2006 & Supp. III 2009). Generally speaking, the "EESA vests the Secretary with the flexibility and power to take bold actions necessary to stabilize the economy." *In re Motors Liquidation Co.*, 430 B.R. 65, 94 (S.D.N.Y. 2010).

Title I of the EESA authorizes the Secretary "to establish the Troubled Asset Relief Program ('TARP') to purchase, and to make and fund commitments to purchase, troubled assets from any financial institution, on such terms and conditions as are

---

[1] *See* Letter for the Honorable David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel, from Neil M. Barofsky, Special Inspector General, Office of the Special Inspector General for the Troubled Asset Relief Program (Aug. 20, 2010) ("SIGTARP Letter"). The Treasury Department General Counsel's request was conveyed orally.

[2] Both the Treasury Department General Counsel and the Special Inspector General for the Troubled Asset Relief Program ("SIGTARP") premise their shared opinion request on the assumption that the Special Master is an officer of the United States. We take that assumption as a given for purposes of this memorandum.

determined by the Secretary." 12 U.S.C. § 5211(a)(1). Section 111 of the EESA, as amended, *see* Pub. L. No. 111-22, § 403, 123 Stat. 1632, 1658 (2009); Pub. L. No. 111-5, § 7001, 123 Stat. 115, 516-20 (2009), imposes requirements on TARP recipients related to corporate governance and executive compensation. *See* 12 U.S.C. § 5221. Subsections (b), (f), and (h) of that section are of particular relevance to determining the status of the Special Master. Subsection (b) provides that "[t]he Secretary shall require each TARP recipient to meet appropriate standards for executive compensation and corporate governance," *id.* § 5221(b)(2); *see also id.* § 5221(b)(1) ("During the period in which any obligation arising from financial assistance provided under the TARP remains outstanding, each TARP recipient shall be subject to . . . the standards established by the Secretary under this section"), and it establishes a series of specific requirements that must be included in those standards, *see id.* § 5221(b)(3).[3] Subsection (f) directs the

---

[3] Those requirements include:

(A) Limits on compensation that exclude incentives for senior executive officers of the TARP recipient to take unnecessary and excessive risks that threaten the value of such recipient during the period in which any obligation arising from financial assistance provided under the TARP remains outstanding.

(B) A provision for the recovery by such TARP recipient of any bonus, retention award, or incentive compensation paid to a senior executive officer and any of the next 20 most highly-compensated employees of the TARP recipient based on statements of earnings, revenues, gains, or other criteria that are later found to be materially inaccurate.

(C) A prohibition on such TARP recipient making any golden parachute payment to a senior executive officer or any of the next 5 most highly-compensated employees of the TARP recipient during the period in which any obligation arising from financial assistance provided under the TARP remains outstanding.

(D) (i) A prohibition on such TARP recipient paying or accruing any bonus, retention award, or incentive compensation during the period in which any obligation arising from financial assistance provided under the TARP remains outstanding, except that any prohibition developed under this paragraph shall not apply to the payment of long-term restricted stock by such TARP recipient, provided that such long-term restricted stock—

(I) does not fully vest during the period in which any obligation arising from financial assistance provided to that TARP recipient remains outstanding;

(II) has a value in an amount that is not greater than 1/3 of the total amount of annual compensation of the employee receiving the stock; and

(III) is subject to such other terms and conditions as the Secretary may determine is in the public interest.

(ii) The prohibition required under clause (i) shall apply as follows:

(I) For any financial institution that received financial assistance provided under the TARP equal to less than $25,000,000, the prohibition shall apply only to the most highly compensated employee of the financial institution.

(II) For any financial institution that received financial assistance provided under the TARP equal to at least $25,000,000, but less than $250,000,000, the prohibition shall apply to at least the 5 most highly-compensated employees of the financial institution, or such higher number as the Secretary may determine is in the public interest with respect to any TARP recipient.

(III) For any financial institution that received financial assistance provided under the TARP equal to at least $250,000,000, but less than $500,000,000, the prohibition shall apply to the senior executive officers and at least the 10 next most highly-compensated employees, or such higher number as the Secretary may determine is in the public interest with respect to any TARP recipient.

Secretary to "review bonuses, retention awards, and other compensation paid to the senior executive officers and the next 20 most highly-compensated employees of each entity receiving TARP assistance before February 17, 2009, to determine whether any such payments were inconsistent with the purposes of this section or the TARP or were otherwise contrary to the public interest." *Id.* § 5221(f). Subsection (h) requires the Secretary to "promulgate regulations to implement this section." *Id.* § 5221(h).

Subsection 101(c) of the EESA provides that "[t]he Secretary is authorized to take such actions as the Secretary deems necessary to carry out the authorities in [the EESA]." 12 U.S.C. § 5211(c). These authorities include, "without limitation," "direct hiring authority with respect to the appointment of employees to administer [the EESA]," *id.* § 5211(c)(1), and "[i]ssuing such regulations and other guidance as may be necessary or appropriate to define terms or carry out the authorities or purposes of [the EESA]," *id.* § 5211(c)(5).

On June 15, 2009, the Secretary issued an Interim Final Rule on TARP Standards for Compensation and Corporate Governance ("Interim Rule"). *See* 74 Fed. Reg. 28,394-28,423 (codified at 31 C.F.R. pt. 30). The Interim Rule, which became effective on the day it was issued, *see* 74 Fed. Reg. at 28,423; 31 C.F.R. § 30.17 (2010), elaborates the specific standards and other requirements relating to corporate governance and executive compensation that section 111 of the EESA establishes for TARP recipients.

To ensure that these requirements are applied "efficiently," "consistently," and "equitably," the Interim Rule further provides that the Secretary "shall establish the Office of the Special Master for TARP Executive Compensation." 74 Fed. Reg. at 28,403; 31 C.F.R. § 30.16(a). The Special Master is to "be appointed by, and serve at the pleasure of, the Secretary," and "may be removed by the Secretary without notice, without cause, and prior to the naming of any successor Special Master." *Id.* The Interim Rule delegates to the Special Master certain of the Secretary's "powers, duties, and responsibilities" relating to enforcement of the Act. *Id.* These delegated functions include: (1) interpreting how the requirements on executive compensation and corporate governance established under section 111 of the EESA, the Interim Rule, and any other

---

(IV) For any financial institution that received financial assistance provided under the TARP equal to $500,000,000 or more, the prohibition shall apply to the senior executive officers and at least the 20 next most highly-compensated employees, or such higher number as the Secretary may determine is in the public interest with respect to any TARP recipient.
(iii) The prohibition required under clause (i) shall not be construed to prohibit any bonus payment required to be paid pursuant to a written employment contract executed on or before February 11, 2009, as such valid employment contracts are determined by the Secretary or the designee of the Secretary.
(E) A prohibition on any compensation plan that would encourage manipulation of the reported earnings of such TARP recipient to enhance the compensation of any of its employees.
(F) A requirement for the establishment of a Board Compensation Committee that meets the requirements of subsection (c).

12 U.S.C. § 5221(b)(3).

applicable guidance apply to TARP recipients and their employees; (2) determining whether compensation paid to employees of TARP recipients prior to February 17, 2009 was "inconsistent with the purposes of section 111 of [the] EESA or TARP, or otherwise contrary to the public interest," and, if so, negotiating with the TARP recipient and the compensated employee for appropriate reimbursement to the Government; (3) determining whether to approve compensation payments to, and compensation structures for, certain highly compensated employees of TARP recipients receiving financial assistance defined by the Interim Rule as "exceptional financial assistance"; and (4) issuing advisory opinions on compensation payments to, and compensation structures for, certain employees of TARP recipients generally. *Id*. § 30.16(a)(1)-(4). In making determinations under paragraphs (2) or (3) and in offering opinions under paragraph (4), the Special Master must follow a set of principles outlined in the Interim Rule. *See id*. § 30.16(a)(2)-(4).[4]

---

[4] The Interim Rule provides:

In reviewing a compensation structure or a compensation payment to determine whether it is inconsistent with the purposes of section 111 of EESA or TARP or is otherwise contrary to the public interest, the Special Master shall apply the principles enumerated below. The principles are intended to be consistent with sound compensation practices appropriate for TARP recipients, and to advance the purposes and considerations described in EESA sections 2 and 103, including the maximization of overall returns to the taxpayers of the United States and providing stability and preventing disruptions to financial markets. The Special Master has discretion to determine the appropriate weight or relevance of a particular principle depending on the facts and circumstances surrounding the compensation structure or payment under consideration, such as whether a payment occurred in the past or is proposed for the future, the role of the employee within the TARP recipient, the situation of the TARP recipient within the marketplace and the amount and type of financial assistance provided. To the extent that two or more principles may appear inconsistent in a particular situation, the Special Master will determine the relative weight to be accorded each principle. In the case of any review of payments already made under paragraph (c)(2) of this section, or of any rights to bonuses, awards, or other compensation already granted, the Special Master shall apply these principles by considering the facts and circumstances at the time the compensation was granted, earned, or paid, as appropriate.

(i) Risk. The compensation structure should avoid incentives to take unnecessary or excessive risks that could threaten the value of the TARP recipient, including incentives that reward employees for short-term or temporary increases in value, performance, or similar measure that may not ultimately be reflected by an increase in the long-term value of the TARP recipient. Accordingly, incentive payments or similar rewards should be structured to be paid over a time horizon that takes into account the risk horizon so that the payment or reward reflects whether the employee's performance over the particular service period has actually contributed to the long-term value of the TARP recipient.

(ii) Taxpayer return. The compensation structure, and amount payable where applicable, should reflect the need for the TARP recipient to remain a competitive enterprise, to retain and recruit talented employees who will contribute to the TARP recipient's future success, and ultimately to be able to repay TARP obligations.

(iii) Appropriate allocation. The compensation structure should appropriately allocate the components of compensation such as salary, short-term and long-term incentives, as well as the extent to which compensation is provided in cash, equity or other types of compensation such as executive pensions, other benefits, or perquisites, based on the specific role of the employee and other relevant circumstances, including the nature and amount of current compensation, deferred compensation, or other compensation and benefits previously paid or awarded. The appropriate allocation may be different for different positions and for different

When acting under paragraphs (2) and (3), the Special Master must make an "initial determination" within 60 days of receiving a "substantially complete submission" from a TARP recipient. *Id.* § 30.16(c)(1). The TARP recipient then has 30 days to request reconsideration of the initial determination, and the Special Master must provide a "final determination" in writing within 30 days thereafter, setting forth the facts and analysis that formed the basis for the determination. *Id.* If the TARP recipient does not request reconsideration within 30 days, the initial determination "shall be treated as a final determination." *Id.*

The Interim Rule also specifies the effects of the Special Master's decisions. The Interim Rule provides that "[i]n the case of any final determination that the TARP recipient is required to receive, the final determination of the Special Master shall be final and binding and treated as the determination of the Treasury." *Id.* § 30.16(c)(2). "An advisory opinion of the Special Master," however, "shall not be binding upon any TARP recipient or employee, but may be relied upon by a TARP recipient or employee if the advisory opinion applies to the TARP recipient and the employee and the TARP recipient and employee comply in all respects with the advisory opinion." *Id.* § 30.16(c)(3).

---

employees, but generally, in the case of an executive or other senior level position a significant portion of the overall compensation should be long-term compensation that aligns the interest of the employee with the interests of shareholders and taxpayers.

(iv) Performance-based compensation. An appropriate portion of the compensation should be performance-based over a relevant performance period. Performance-based compensation should be determined through tailored metrics that encompass individual performance and/or the performance of the TARP recipient or a relevant business unit taking into consideration specific business objectives. Performance metrics may relate to employee compliance with relevant corporate policies. In addition, the likelihood of meeting the performance metrics should not be so great that the arrangement fails to provide an adequate incentive for the employee to perform, and performance metrics should be measurable, enforceable, and actually enforced if not met. The appropriate allocation and the appropriate performance metrics may be different for different positions and for different employees, but generally a significant portion of total compensation should be performance-based compensation, and generally that portion should be greater for positions that exercise higher levels of responsibility.

(v) Comparable structures and payments. The compensation structure, and amount payable where applicable, should be consistent with, and not excessive, taking into account compensation structures and amounts for persons in similar positions or roles at similar entities that are similarly situated, including, as applicable, entities competing in the same markets and similarly situated entities that are financially distressed or that are contemplating or undergoing reorganization.

(vi) Employee contribution to TARP recipient value. The compensation structure, and amount payable where applicable, should reflect the current or prospective contributions of an employee to the value of the TARP recipient, taking into account multiple factors such as revenue production, specific expertise, compliance with company policy and regulation (including risk management), and corporate leadership, as well as the role the employee may have had with respect to any change in the financial health or competitive position of the TARP recipient.

31 C.F.R. § 30.16(b).

Finally, the Interim Rule provides that the Special Master "shall have such other duties and powers related to the application of compensation issues arising in the administration of [the] EESA or TARP as the Secretary or the Secretary's designate may delegate to the Special Master, including, but not limited to, the interpretation or application of contractual provisions between the Federal government and a TARP recipient as those provisions relate to the compensation paid to, or accrued by, an employee of such TARP recipient." *Id*. § 30.16(a)(5).[5]

## II

The Appointments Clause states:

[The President] . . . shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2. As the Clause thus makes clear, officers of the United States fall into two basic categories: principal officers and inferior officers. *See*, *e.g.*, *United States v. Germaine*, 99 U.S. 508, 509 (1878) ("The Constitution for purposes of appointment . . . divides all its officers into two classes."); *see also Morrison v. Olson*, 487 U.S. 654, 670 (1988). Principal officers must be appointed by the President, by and with the advice and consent of the Senate. Inferior officers must be appointed in the same manner, unless Congress "by Law vest[s] the[ir] Appointment . . . in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2; *see Morrison*, 487 U.S. at 670-71; *Buckley v. Valeo*, 424 U.S. 1, 132 (1976) (per curiam). "[T]he terms of the Appointments Clause set out the only means by which Congress may provide for the appointment of 'Officers of the United States,'" *The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 139 (1996) (citing *Buckley*, 424 U.S. at 124-37), and "[n]either Congress nor the Executive can agree to waive this structural protection," *Freytag v. Commissioner of Internal Revenue*, 501 U.S. 868, 880 (1991).

The Special Inspector General for the Troubled Asset Relief Program ("SIGTARP") questions whether the Special Master is a principal officer because, in his

---

[5] The preamble to the Interim Rule characterizes the Special Master's residual authority as limited to matters arising under section 111 of the EESA. It states that "[t]he scope of the Special Master's authority and responsibility is limited to compensation and corporate governance matters *under section 111* with respect to TARP recipients, and the Special Master has no authority to provide guidance or review any submissions with respect to matters other than compensation and corporate governance matters *under section 111*, or to provide guidance or review any submissions with respect to compensation or corporate governance matters of employers that are not TARP recipients." 74 Fed. Reg. at 28,404 (emphasis added). The Treasury Department General Counsel's Office has informed us that the Secretary has not assigned any additional functions to the Special Master under this provision.

view, "the Secretary appears to be without authority to control the actions of the Special Master in any . . . meaningful manner" other than removal. SIGTARP Letter at 5.[6] If the Special Master were indeed a principal officer, his appointment by the Secretary would not be in conformity with the Appointments Clause.

In our view, the Special Master is not a principal officer. The Supreme Court has "not set forth an exclusive criterion for distinguishing between principal and inferior officers for Appointments Clause purposes." *Edmond v. United States*, 520 U.S. 651, 661 (1997). But in three decisions over the past quarter century the Court has set out a number of important guideposts by which to distinguish principal from inferior officers.

In *Morrison v. Olson*, 487 U.S. 654 (1988), the Supreme Court considered whether an independent counsel appointed pursuant to the Ethics in Government Act of 1978, 28 U.S.C. §§ 591-599 (1988), was an inferior officer. It concluded that she was, based on four considerations. First, the Court noted that the independent counsel was "subject to removal by a higher Executive Branch official" (the Attorney General). *Morrison*, 487 U.S. at 671. The Court explained that this factor weighed in favor of viewing the independent counsel as an inferior officer even though "she possesse[d] a degree of independent discretion to exercise the powers delegated to her under the Act." *Id*. Second, the Court relied on the fact that the independent counsel performed what it considered only "limited duties" because she was "restricted primarily to investigation and, if appropriate, prosecution for certain federal crimes." *Id*. The Court acknowledged that the Ethics in Government Act gave the independent counsel "full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice," but thought it significant that "this grant of authority does not include any authority to formulate policy for the Government or the Executive Branch, nor does it give appellant any administrative duties outside of those necessary to operate her office." *Id*. at 671-72. Third, the Court stressed that the independent counsel's jurisdiction was relatively narrow, both because the Ethics in Government Act itself was "restricted in applicability to certain federal officials suspected of certain serious federal crimes" and because "an independent counsel can only act within the scope of the jurisdiction that has been granted by the Special Division pursuant to a request by the Attorney General." *Id*. at 672. Fourth, the Court pointed out that the independent counsel's tenure was "limited" because while her office had no fixed term, it was "'temporary' in the sense that an independent counsel is appointed essentially to accomplish a single task, and when that task is over the office is terminated." *Id.*

Almost a decade after *Morrison*, the Court returned to the distinction between principal and inferior officers in *Edmond v. United States*, 520 U.S. 651 (1997). *Edmond*

---

[6] The Office of the Special Inspector General for the Troubled Asset Relief Program was created by the EESA. *See* 12 U.S.C. § 5231(a). The Office is headed by a Special Inspector General—the SIGTARP—who is appointed by the President, with the advice and consent of the Senate. *See id.* § 5231(b). The duties of the SIGTARP include conducting audits and investigations of the Secretary's purchase, management, and sale of assets under the TARP and of the Secretary's management of the TARP, as well as conducting audits and investigations of other actions taken under the EESA. *See id.* § 5231(c)(1), (4).

concerned civilians appointed by the Secretary of Transportation to serve as military judges on the Coast Guard Court of Criminal Appeals. The Supreme Court concluded that the judges were inferior officers, but it characterized the factors it had relied on in *Morrison* as not "definitive" and adopted a somewhat different approach. *Id*. at 661.

The Court acknowledged that judges on the Coast Guard Court of Criminal Appeals did not have a "narrow" jurisdiction or "limited" tenure, as those terms had been used in *Morrison*, and that the third and fourth considerations discussed in *Morrison* thus cut against characterizing the judges as inferior officers. *See id*. It nonetheless deemed them inferior officers because their work was "directed and supervised at some level by other [officers] who were appointed by Presidential nomination with the advice and consent of the Senate." *Id*. at 663. That supervision, the Court explained, was carried out by two Executive Branch actors. The Judge Advocate General of the Coast Guard (the Secretary of Transportation's subordinate) "exercise[d] administrative oversight over the Court of Criminal Appeals" in that the Judge Advocate General established the court's rules of procedure, could order any of its decisions submitted for review, and could remove judges without cause. *Id.* at 664, 666. And the Court of Appeals for the Armed Forces (an Executive Branch tribunal) could review and reverse the lower tribunal's decisions, and prevent any final order from being issued. *See id.* at 664-65. Thus, "[w]hat is significant," the Supreme Court explained, "is that the judges of the Court of Criminal Appeals have no power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers." *Id*. at 665.

Rather than listing a number of non-exclusive factors as it had done in *Morrison*, then, the Court in *Edmond* appeared to offer one overall standard for identifying inferior officers. "Generally speaking," the Court stated, "the term 'inferior officer' connotes a relationship with some higher ranking officer or officers below the President: Whether one is an 'inferior' officer depends on whether he has a superior." *Id*. at 662. At the same time, the Court indicated that determining whether an officer has a superior in this sense may well require considering a number of factors, including whether the officer is removable by an Executive Branch official below the President and whether the officer's work "is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Id*. at 663.

Earlier this year, the Supreme Court followed the *Edmond* approach for distinguishing inferior from principal officers in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 130 S. Ct. 3139 (June 28, 2010). In *Free Enterprise Fund*, the Court considered separation-of-powers and Appointments Clause challenges to the structure of the Public Company Accounting Oversight Board ("PCAOB"), a statutorily created entity with "expansive powers to govern [the accounting] industry." *Id*. at 3147. The statute establishing the PCAOB, the Sarbanes-Oxley Act of 2002, 15 U.S.C. §§ 7211-7219 ("SOX Act"), provided for the Securities and Exchange Commission ("SEC") to appoint the PCAOB's members.[7] The SOX Act

---

[7] The parties stipulated that SEC Commissioners could not be removed by the President except for "'inefficiency, neglect of duty, or malfeasance in office,'" and the Court decided the case based on that understanding. *Free Enterprise Fund*, 130 S. Ct. at 3148-49.

also granted the SEC "[b]road power over [the PCAOB] functions," *id*. at 3148, including approving the PCAOB's budget, issuing regulations that bind it, relieving the PCAOB of authority, amending and denying approval for PCAOB sanctions and rules, and enforcing PCAOB rules on its own. *See id.* at 3158. Under the SOX Act as enacted, however, the SEC could remove PCAOB members only "'for good cause shown,'" "'in accordance with'" specified procedures. *Id.* at 3148 (quoting 15 U.S.C. § 7211(e)(6)). The Court held that the resulting dual for-cause limitations on the President's ability to remove PCAOB members—with the SEC Commissioners removable by the President only for good cause, and the PCAOB members removable by the SEC only for another, more restrictive type of good cause specified in the SOX Act— was "contrary to Article II's vesting of the executive power in the President," and therefore violated the separation of powers. *Id.* at 3147, 3154. To remedy the infirmity, the Court excised from the SOX Act the provision making PCAOB members removable only for cause, thus rendering them removable by the SEC at will.

Turning to the Appointments Clause challenge under this modified statutory structure, the Court concluded that the PCAOB's members were properly appointed inferior officers. "Given that the Commission is properly viewed, under the Constitution, as possessing the power to remove Board members at will," the Court explained, "and given the Commission's other oversight authority, we have no hesitation in concluding that under *Edmond* the Board members are inferior officers." *Id.* at 3162.

Both *Edmond* and *Free Enterprise Foundation* indicate that the level of direction and supervision exercised by a superior over a subordinate need not be total for the subordinate to qualify as an inferior officer. In *Edmond*, for example, the Court acknowledged that the scope of substantive review that the Court of Appeals for the Armed Forces exercised over the Court of Criminal Appeals "is narrower than that exercised by the Court of Criminal Appeals," because "so long as there is some competent evidence in the record to establish each element of the offense beyond a reasonable doubt, the Court of Appeals for the Armed Forces will not reevaluate the facts." 520 U.S. at 665. What was "significant" in concluding that the Court of Criminal Appeals judges nonetheless were inferior officers, however, was that they "have no power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers." *Id*. Similarly, in *Free Enterprise Foundation*, the Court rejected the proposition that the SEC's power over the PCAOB's activities was "plenary." 130 S. Ct. at 3159. Rather, the Court observed, the PCAOB "is empowered to take significant enforcement actions, and does so largely independently of the Commission"; indeed, "the Act nowhere gives the Commission effective power to start, stop, or alter individual Board investigations." *Id.*; *see also id.* at 3159 ("The Board . . . has significant independence in determining its priorities and intervening in the affairs of regulated firms (and the lives of their associated persons) without Commission preapproval or direction."). Thus, *Edmond* and *Free Enterprise Foundation* make clear (as had *Morrison*) that an Executive official can exercise some level of independent authority and still qualify as an inferior officer, so long as it can be said that the official "is directed and supervised *at some level* by others who were appointed by Presidential

nomination with the advice and consent of the Senate." *Edmond*, 520 U.S. at 663 (emphasis added).

## III

Applying the principles established by the Supreme Court, we think it clear that the Special Master is not a principal officer. If one looks to the four *Morrison* factors—removal, duties, jurisdiction, and tenure—they all point in favor of the conclusion that the Special Master is not a principal officer. The Special Master is subject to at-will removal by the Secretary (without "notice" or "cause"). 31 C.F.R. § 30.16(a). The Special Master's duties are limited. As indicated above, they consist of interpreting EESA-related requirements on TARP recipients' executive compensation and corporate governance, negotiating reimbursements for improper compensation payments made by TARP recipients before February 17, 2009, determining whether to approve compensation payments and structures relating to certain employees of TARP recipients receiving "exceptional financial assistance," and issuing advisory opinions. *See supra* pp. 3-5 & n.4. Like the independent counsel in *Morrison*, the Special Master thus lacks both "authority to formulate policy for the Government or the Executive Branch" and significant administrative duties. 487 U.S. at 671-72.[8] While the Special Master is entrusted with authority to interpret section 111 of the EESA, the Interim Rule, and related guidance, the Special Master is authorized to do so only in applying those provisions to the compensation practices of particular TARP recipients and certain of their employees. The Special Master's jurisdiction is limited to TARP recipients' executive compensation and corporate governance. *See id.* And the Special Master's tenure is limited to the duration of the Secretary's authority under section 111 of EESA, namely "the period in which any obligation arising from financial assistance provided under the TARP remains outstanding." 12 U.S.C. § 5221(b)(1). The Special Master, then, bears each of the marks of inferior officer status attributed to the independent counsel in *Morrison*.

If one looks not to the *Morrison* factors, but instead to the *Edmond* considerations of whether the Special Master is removable by an officer other than the President and whether the Special Master's work is subject to "some level" of "direct[ion] and supervis[ion]" by an official appointed by the President, with the advice and consent of the Senate—here, the Secretary of the Treasury—again we think it clear that the Special Master is not a principal officer. 520 U.S. at 663.

---

[8] Under the Interim Rule's residual clause, the Special Master may also be given those "duties and powers related to the application of compensation [and corporate governance] issues arising in the administration of [the] EESA or TARP as the Secretary or the Secretary's designate may delegate to the Special Master." 31 C.F.R. § 30.16(a)(5). But while the outer limit of those potential duties—none of which has been granted—is not precisely defined, the clause by its terms encompasses only the "application" of compensation issues. *Id.* Accordingly, we do not believe that the clause contemplates the Secretary's delegation to the Special Master of authorities under section 111 that might be characterized as more closely resembling policymaking, such as the establishment of executive compensation and corporate governance standards. *Cf.* 12 U.S.C. § 5221(b)(2).

First, the Special Master is removable by the Treasury Secretary at will. The Special Master serves "at the pleasure of the Secretary, and may be removed by the Secretary without notice, without cause, and prior to the naming of any successor Special Master." 31 C.F.R. § 30.16(a). As the Supreme Court has remarked more than once, "[t]he power to remove officers . . . is a powerful tool for control." *Edmond*, 520 U.S. at 664 (citing *Bowsher v. Synar*, 478 U.S. 714, 727 (1986) and *Myers v. United States*, 272 U.S. 52 (1927)); *see Free Enterprise Fund*, 130 S. Ct. at 3162 ("'[t]he power to remove officers' at will and without cause 'is a powerful tool for control' of an inferior" (quoting *Edmond*)).

Second, the Treasury Department has reasonably construed the Interim Rule as not precluding the Treasury Secretary from reviewing and revising the Special Master's determinations should the Secretary choose to exercise that authority.

Whether the Interim Rule permits the Special Master's determinations to be reviewed by the Treasury Secretary is a point of contention between the SIGTARP and the Treasury Department. The SIGTARP argues that the Interim Rule insulates the Special Master's determinations from Secretarial review. He notes that the Interim Rule "does not expressly authorize any internal approval or review of the Special Master's actions." SIGTARP Letter at 8. Instead, by making the "final determinations" of the Special Master "final and binding" and "treated as the determination of the Treasury," the SIGTARP contends, the Interim Rule precludes further review. *Id.* The Treasury Department, by contrast, takes the view that the Special Master's "decisions remain subject to further review within the Treasury."[9]

Our approach to this question is informed by the familiar principle that the Secretary's interpretation of his own regulations is entitled to deference "unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989), in turn quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). We think the Treasury Department's interpretation of the Interim Rule readily meets that standard.

The Interim Rule's lack of an express authorization for Secretarial review of the Special Master's determination does not imply preclusion of such review. On the contrary, by statute the Secretary is "the head of the Department," 31 U.S.C. § 301(b), and is vested with the "[d]uties and powers of the officers and employees of the Department," *id*. § 321(c). In our view, these statutes create a strong presumption that officials within the Department are subject to the Secretary's supervision, including the

---

[9]  Letter for Bryan Saddler, Chief Counsel, SIGTARP, from Timothy G. Massad, Chief Counsel, Office of Financial Stability at 2 (Mar. 26, 2010); *see* Letter for Bryan Saddler, Chief Counsel, Special Inspector General for the Troubled Asset Relief Program, Department of the Treasury, from Timothy G. Massad, Chief Counsel, Office of Financial Stability, at 1 (July 29, 2010) ("the decisions of the Special Master are subject to review (*i.e.*, can be reviewed) by other officials within Treasury"). The Treasury Department General Counsel's Office has confirmed for us that these statements reflect the view of the Secretary of the Treasury.

authority to review and reverse their decisions. This default rule may be overcome, we have suggested, when there is "specific and explicit *reservation* of 'final decisionmaking power' in a subordinate official," in the sense of a preclusion of the presumptive reviewing authority possessed by the department head. Memorandum for the Deputy Attorney General, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Authority of the Attorney General Over the National Institute of Justice and the Bureau of Justice Statistics* at 2 (Oct. 14, 1980) ("NIJ/BJS Memo") (emphasis added); *see also* Memorandum for David D. Aufhauser, General Counsel, Department of the Treasury, from M. Edward Whelan III, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Under Secretary of Treasury for Enforcement*, at 3 (Dec. 19, 2002) (applying similar principle to Treasury Department). But we think it reasonable to conclude that the Interim Rule lacks a clear enough preclusion of Secretarial review to overcome the presumption of Secretarial supervisory authority.

To be sure, the Interim Rule characterizes the Special Master's final determinations as "final and binding" and directs that they be "treated as the determination of the Treasury." 31 C.F.R. § 30.16(c)(2). But those phrases by themselves do not necessarily, or even most naturally, amount to the sort of specific and explicit reservation of decision-making power in the Special Master that would insulate the Special Master's final determinations from Secretarial review. Indeed, on at least two occasions we have concluded that similar phrases were inadequate to demonstrate an intent to insulate subordinate officials' decisions from review by the head of a Department. *See* Memorandum for Alan C. Raul, General Counsel, Department of Agriculture, from Doug R. Cox, Deputy Assistant Attorney General, *Re: Secretary of Agriculture Review of ALJ Decisions* (Feb. 20, 1991) ("*Secretary of Agriculture Review of ALJ Decisions*") (statute providing that subordinate officials' decisions "shall be final" and "shall take effect" thirty days after notice of their delivery did not prohibit issuance of regulations providing for Secretarial review); *Secretary of Education Review of Administrative Law Judge Decisions*, 15 Op. O.L.C. 8, 10-13 (1991) ("*Secretary of Education Review of ALJ Decisions*") (statute providing that an administrative law judge's decision "shall be considered to be a final agency action" did not preclude further agency review). As we explained in the earlier of those opinions, when a statute (or regulation) refers to a decision as "final agency action" it is often "understood to mean that action which is necessary and sufficient for judicial review" under the Administrative Procedure Act even though the decision may be "subject to reconsideration or appeal to a higher authority within the agency." *Id*. at 10-11; *cf. Darby v. Cisneros*, 509 U.S. 137, 144-47 (1993) (explaining that agency decisions may be final for purposes of judicial review even though additional, optional levels of administrative review may be available). As we made clear in the later of those prior opinions, we have concluded that it was reasonable to attach the same interpretation to a statute (or regulation) that characterizes an official's decision as "final." *See Secretary of Agriculture Review of ALJ Decisions* at 1-2.[10]

---

[10] The SIGTARP contends that our opinion in *Secretary of Education Review of ALJ Decisions* is "largely inapposite" because the statute at issue there and the Interim Rule differ in two material respects. SIGTARP Letter at 6. First, the SIGTARP points out that the statute at issue in *Secretary of Education Review of ALJ Decisions* used the phrase "*shall be considered to be* a final agency action," whereas the

Similarly, the Interim Rule's characterization of the Special Master's final determinations as "final and binding" may reasonably be understood as intended not to insulate the Special Master's decisions from Secretarial review, but instead to make clear when the Special Master's decisions take effect and thus become ripe for judicial review. This understanding draws support from the Interim Rule's distinction between "initial determinations" and "final determinations." 31 C.F.R. § 30.16(c)(1). After the Special Master renders an "initial determination," the TARP recipient has 30 days to request reconsideration, and the Special Master must provide a "final determination" in writing within 30 days thereafter, setting forth the facts and analysis that formed the basis for the determination. *Id*. If the TARP recipient does not request reconsideration within 30 days, the initial determination "shall be treated as a final determination." *Id.* Initial determinations trigger a deadline for a reconsideration request; final determinations impose an obligation to abide by the Special Master's directives and thus signal an entitlement to seek judicial review. Given these other legal effects, we do not see any reason to conclude that the terms "final and binding" in the Interim Rule must be read to have the additional effect of insulating the Special Master's decisions from further review by the Secretary.

A comparison of the Interim Rule with a regulation the Supreme Court has found to impose a limitation on review by the head of a department underscores the point that the Treasury Department's understanding of the Interim Rule as not involving such elimination of Secretarial review is reasonable. In *United States v. Nixon*, 418 U.S. 683 (1974), the Court found that a regulation delegating authority in certain matters to a Special Prosecutor and providing that "[t]he Attorney General will not countermand or interfere with the Special Prosecutor's decisions or actions" shielded the Special Prosecutor's decisions from revision by the Attorney General. *Id*. at 694 n.8. That language is much more direct and specific than the language in the Interim Rule. It

---

Interim Rule provides that "final determinations" of the Special Master "*shall be* final and binding and treated as the determination of the Treasury." *See* SIGTARP Letter at 6-7. We do not think, however, that the absence of the verb "considered" is decisive (particularly given the Interim Rule's use of the similar verb "treated"). Indeed, we have previously rejected such a distinction. Admittedly, in *Secretary of Education Review of ALJ Decisions*, we determined that Congress's use of "shall be considered" instead of the more unequivocal "shall be" made it easier to conclude that Congress did not intend to preclude further agency review. "[L]anguage that the ALJ's decision 'shall be the final agency action'," we explained, "would, at a minimum, present a question as to whether Congress intended for the ALJ decision to be final in the sense that no further agency review is available." 15 Op. O.L.C. at 10 n.3. Nevertheless, we concluded that it was "unlikely that we would construe even this language to express an intent to foreclose secretarial review, absent affirmative evidence that Congress so intended." *Id*. A month later we made good on that prediction by finding that a statute using the phrase "shall be final"—without the "considered" phrasing—also did not preclude Secretarial review. *See Secretary of Agriculture Review of ALJ decisions* at 1-2. Second, the SIGTARP emphasizes that the statute at issue in *Secretary of Education Review of ALJ Decisions* used the phrase "final agency action," a term borrowed almost directly from the Administrative Procedure Act, *see* 5 U.S.C. § 704 ("final agency action for which there is no other adequate remedy in a court [is] subject to judicial review"), while the Interim Rule uses "final determination" and "final and binding." *See* SIGTARP Letter at 7. Again, we hardly think that difference is decisive, as our memorandum on *Secretary of Agriculture Review of ALJ Decisions*, which addressed a statute characterizing officials' decisions as "final" (rather than as "final agency action"), indicates.

constitutes the sort of "specific and explicit reservation of 'final decisionmaking power'" that we have indicated would be necessary to shield a subordinate official's decisions from review by a Department head.

For all these reasons, we think the Treasury Department's interpretation of the Interim Rule as not precluding Secretarial review of the Special Master's determinations is not plainly erroneous or inconsistent with the Interim Rule.[11]

A third consideration, not necessary to our analysis, may offer some further support for the conclusion that the Special Master is not a principal officer. The Secretary has established the specific functions of the Special Master by regulation and thus may alter the Special Master's powers, or even abolish the position, by regulation. The degree of incremental control this regulatory power over the Special Master affords the Secretary is not clear, given both that (i) were the Secretary to eliminate or modify the position of Special Master, he would need to do so by regulation, and that revising regulation would have to conform to statutes placing procedural limits on the Secretary's rulemaking authority and (ii) the Special Master is already subject to removal by the Secretary without cause.[12] But this power may represent some small additional lever of "direct[ion] and supervis[ion]." *Edmond*, 520 U.S. at 663.

---

[11] We do not mean to suggest that use of the term "final," when considered in context and in conjunction with other considerations, may never lead to the conclusion that a statute or regulation was intended to insulate a subordinate official's decisions from review by the head of a Department. In at least one instance, for example, we have advised that an explicit statutory delegation of "final authority over all grants, cooperative agreements, and contracts" to the "Directors" of certain entities established by statute within the Department of Justice precluded the Attorney General from overturning the Directors' decisions. NIJ/BJS Memo at 2. But our reasoning in reaching that conclusion only confirms the reasonableness of interpreting the Interim Rule as not precluding Secretarial review.

First, the statute at issue in that earlier memorandum did not characterize the subordinate officials' individual decisions as "final," let alone contrast such "final determinations" with "initial determinations," as the Interim Rule does. Rather, that statute endowed those officials with "final *authority*" over several classes of decisions. *Id.* at 1. The latter wording is not easily understood as simply identifying certain decisions as ready for judicial review; instead it is much more readily understood as granting certain officials the last word in the Department. Second, as we noted, the legislative history of the statute at issue in that memorandum supported the conclusion that Congress intended the Directors created by the statute to be protected from reversal by the Attorney General. *See id.* Third, the Directors, unlike the Special Master, were appointed by the President, with the advice and consent of the Senate. That eliminated any concern rooted in the Appointments Clause that might have counseled against finding that the Directors' decisions were shielded from review by the Attorney General. Here, such constitutional avoidance concerns would, if anything, support the reasonableness of reading the Interim Rule as not precluding Secretarial review of the Special Master's decisions. *See generally Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges*, 19 Op. O.L.C. 350, 352 (1995) (describing avoidance canon and noting its use in Executive Branch legal interpretation).

[12] *Compare Morrison*, 487 U.S. at 721 (Scalia, J., dissenting) (characterizing power of "amending or revoking [an authorizing] regulation" as a means of at-will removal); *and In re Sealed Case*, 829 F.2d 50, 56-57 (D.C. Cir. 1987) (Attorney General's ability to abolish position of Iran-Contra Independent Counsel by rescinding authorizing regulation supports conclusion that Independent Counsel is not a principal officer), *with Free Enterprise Fund*, 130 S. Ct at 3158-59 ("[A]ltering the . . . powers of an agency as a whole is a problematic way to control an inferior officer. The Commission cannot wield a free hand to supervise individual members if it must destroy the Board in order to fix it.").

\*　　\*　　\*　　\*

Accordingly, whether we apply the *Morrison* or the *Edmond* analysis, the Special Master is not a principal officer and therefore need not be appointed by the President, by and with the advice and consent of the Senate.

*/s/*

Jonathan G. Cedarbaum
Acting Assistant Attorney General